92 N.J. Super. 519 (1966)
224 A.2d 143
IRWIN RAY, AS TRUSTEE IN REORGANIZATION OF ATLAS SEWING CENTERS, INC., A DELAWARE CORPORATION, AND ITS SUBSIDIARIES, AND ATLAS SEWING CENTERS, INC., A DELAWARE CORPORATION, PLAINTIFFS,
v.
BENEFICIAL FINANCE CO. OF NORTH JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 27, 1966.
*522 Mr. Joseph Harrison argued the cause for the plaintiffs (Messrs. Harrison & Jacobs, attorneys).
Mr. Charles J. Milton argued the cause for the defendant (Messrs. Charles J. Milton, Harold A. Seide, Jr. and David *523 A. Nicolette, Jr. on the brief; Messrs. Harold A. Price and Donald W. Bedell of counsel; Messrs. Milton, Keane & De Bona, attorneys).
FRITZ, J.S.C.
For approximately 15 years prior to June 22, 1962 plaintiff Atlas Sewing Centers, Inc. was engaged in the business of selling sewing machines and certain other equipment. Many of these sales were pursuant to installment sales contracts supported by notes. Sometime around mid-1960 a number of the 50-odd financial institutions to which Atlas was indebted to the extent of almost 14 million dollars became apprehensive. Atlas presumed, probably quite correctly, that unless these institutional creditors could be appeased by prompt financial arrangements, Atlas' financial picture would deteriorate forthwith in a manner fatal to continued operation. Its projection into involuntary bankruptcy was candidly suggested by one or more of these institutional creditors.
Accordingly, on November 9, 1960 Atlas and its subsidiaries entered into an agreement with these institutional creditors providing, inter alia, for the "transfer, pledge, assignment and delivery" to a named custodian, of all customer contracts, chattel mortgages, notes, and like commercial instruments, as "collateral security for the payment of" indebtedness to these creditors. Provision was made for periodic deposit of newly generated commercial paper. While this agreement abounds with infinite protective phraseology favoring the institutions, including the subordination of certain prior debentures of Atlas to the "Superior Debt" of the agreement and including such warranties as that of Atlas not to "discount, sell, pledge, transfer, assign or dispose of" the subject commercial obligations "except as contemplated herein," it appears clear that this was a security arrangement, designed (a) to assure these creditors of the application of money received on the obligations to the obligation of Atlas to them, and (b) to inspire in Atlas renewed and more regular efforts to turn its commercial paper into cash. In this latter regard *524 a provision of this agreement required Atlas to "sell" at least 25% of its newly generated obligations each month, and after noting that this percentage could be increased or decreased "at the sole discretion" of a certain class of the institutional signatories called the "Majority Holders," further provided that Atlas should "at any time or from time to time * * * sell [its commercial paper] in such amounts and upon such terms and provisions as the Majority Holders shall direct."
In any event, Atlas was to continue to collect the receivables and such collections were to be deposited in a special trust account for the exclusive benefit of these institutional creditors.
On January 27, 1961 Atlas entered into several further agreements relating to its commercial paper. The prime contracts of that date were denominated "Master Agreement No. 1" and "Master Agreement No. 2." The parties to each were Atlas and its subsidiaries, and Beneficial Finance Co. of North Jersey, defendant herein. Each Master Agreement was executed in the context of two collateral agreements, the first of which was between the Majority Holders and Beneficial and the second of which was between the Majority Holders and Atlas and its subsidiaries.
It appears that the principal distinction between the two Master Agreements is that No. 1 concerned itself with existent obligations and No. 2 contemplated obligations to be generated by future sales activity. Irrespective of this, Master Agreement No. 2 and its collateral contracts were evidently abandoned by consent of all parties on or about March 24, 1961, for reasons which do not appear. Further reference herein to the Master Agreement or its collateral agreements will be to Master Agreement No. 1 unless specific reference appears to the contrary.
The Master Agreement between Atlas and Beneficial professed Atlas' desire "to sell" certain obligations to Beneficial. This concept of a "sale" is reiterated throughout the instrument in such phrases as "any note sold," "of such purchase [of the notes]," etc. On occasion "sale" appears conjunctively *525 with "assignment" and at other places reference is to "assignment" alone. The physical transfer was to be accomplished by a vehicle called an "Assignment in Bulk," which recited that Atlas did thereby "sell, assign and transfer" the obligations.
The consideration was expressed in a section of the Master Agreement entitled "Purchase Price of Notes." The consideration to be paid warrants quotation:
"The amount which you [Beneficial] will pay for the assignment of any such note shall be 75% of the actual collections on such note, giving effect of course, in determining such amount, to any refund or credit of the time price differential, finance charge or the like."
Provision appears for remittances to be made to Irving Trust Company, "as Agent for the Institutions under the agreement made as of November 9, 1960, as amended."
In a section entitled "Reassignment" it was agreed that if Beneficial determined a note to be uncollectible, or a six-month lapse from the date of last payment occurred, Beneficial "may reassign and deliver such note" to a designee of Irving Trust Company. Atlas, in precise terms, surrendered completely its right to make any further collection and acknowledged an obligation to refuse any payments. The debtor was to be referred to Beneficial.
The Master Agreement and each of the subordinate agreements made specific reference to the November 9, 1960 agreement. Each of the subordinate agreements also referred to the Master Agreement. The subordinate agreement between Atlas and the Majority Holders referred to the Beneficial-Majority Holders subordinate agreement. While the Beneficial-Majority Holders agreement does not refer specifically to the Atlas-Majority Holders agreement, the parties acknowledge that Beneficial was given at least an abridged copy of this agreement. Beneficial asserts that paragraph 3 (recited at length below) was not contained in this copy but concedes they did receive a copy of the balance.
The Atlas-Majority Holders agreement stipulated:
*526 "3. You [Majority Holders] and we [Atlas] hereby confirm that the Master Agreement constitutes an agreement for servicing the collection of the notes by Beneficial and a security device for the benefit of the Institutions and certain other creditors of the undersigned as aforesaid supplementing the provisions of aforesaid Agreement made as of November 9, 1960 and all assignments heretofore executed and delivered by the undersigned for such purpose, and, notwithstanding anything herein or in the Master Agreement to the contrary, does not constitute a loan by, or other disposition of the notes to, Beneficial. We will make no changes in the Master Agreement without first consulting you and obtaining your prior written consent.

* * * * * * * *
5. (a) This agreement, the Master Agreement, and Agreement No. 1 dated January 27, 1961 between the Majority Holders and Beneficial shall constitute a supplement within the terms and provisions of the Agreement made as of November 9, 1960, with Beneficial being hereby substituted for the Custodian with respect to the notes delivered to it and also for the banks of deposit."
The Beneficial-Majority Holders agreement contained the following language:
"2. Subject to your [Beneficial's] paramount right, title and interest in the notes as provided in said Master Agreement, the rights of the Institutions as provided in the aforesaid Agreement made as of November 9, 1960, as amended, and in any assignments made pursuant thereto, or otherwise, in and to the notes, the property covered thereby and the proceeds therefrom, are hereby expressly preserved and maintained; * * *."
One of the issues here joined, and considered at length infra, concerns itself with whether such agreements constituted a sale of the obligations to Beneficial, or instead, the creation of an agency. Irrespective of the determination in this regard, it appears without dispute that Beneficial did embark upon some program of collection, some remittances were made, and some obligations returned. Whatever these agreements were, they were, on significant dates as they shall hereafter appear, partly executed and partly executory.
In June 1962 Atlas Sewing Centers, Inc. filed a petition in the United States District Court for the Southern District of Florida, for reorganization under chapter X of the Federal Bankruptcy Act. 11 U.S.C.A. § 501 et seq. Irwin Ray, a plaintiff herein, was appointed trustee.
*527 In September 1962, pursuant to 11 U.S.C.A. § 516 (1). commonly known as section 116(1) of the Bankruptcy Act, the trustee filed a petition in the District Court seeking to "reject the executory contract by and between" Atlas and Beneficial. He also sought an accounting, an order that Beneficial return all the commercial paper, and permission to undertake collection of the returned receivables. Among other allegations this petition charged Beneficial with "not exercising its best efforts in the collection of ATLAS paper remaining in its hands." The petition also showed a purported "unverified accounting" of prior collections by Beneficial under Master Agreement No. 1, and claimed that the trustee was in a position "to effectuate collection of all paper presently in the hands of Beneficial" and at less expense to Atlas than the "executory contract with Beneficial" was costing.
On November 8, 1962 a hearing on this petition was held in the District Court. Beneficial appeared by counsel and participated actively. In addition to making its position clear by an insistence in colloquy with the presiding judge that, "It is our [Beneficial's] position it [the Master Agreement] is a purchase," Beneficial filed a motion to strike the prayers of the trustee's petition which sought the accounting, the return of the paper and permission for the trustee to collect the receivables. This motion challenged the jurisdiction of the court in connection with the proposed application of section 116.1 to this transaction. Of interest is the fact that this motion did not specifically seek to dismiss the trustee's prayer that he be allowed to reject the contract, although clearly a successful challenge to the jurisdiction would have accomplished this purpose. Beyond this, had Beneficial prevailed on its motion as stated, even a permitted bare "rejection" would have been an obvious futility.
Beneficial did not prevail on its motion. After the hearing on the petition, involving both testimony and the introduction of exhibits, Beneficial was given additional time to produce evidence on its behalf, but no such evidence was offered. *528 On December 14, 1962 an order was entered dismissing Beneficial's motion and granting all prayers of the trustee's petition. This order recited a finding by the Court that "the contract by and between the debtors in reorganization and Beneficial Finance Company is executory and burdensome to the estate of the debtors," and its entry was "deemed to constitute a rejection of said contract by the Trustee."
On December 20, 1962 Beneficial appealed to the United States Circuit Court from this order. The District Court, on March 6, 1963, entered a supplementary order, preserving the rights and positions of the parties pending the appeal, and providing the details of the mechanics necessary to effectuate its order of December 14.
Beneficial's notice of appeal recited the directions of the District Court's order, and concluded, "* * * all as against the special appearance and claim by appellant that these properties were held in a bona fide claim of title, with fee simple title vested in appellant, and against the further claim that the United States District Court, Southern District of Florida, did not have jurisdiction in a summary proceeding to institute such procedure or to make such orders and grant the relief covered in said order." (Emphasis supplied) In its brief before the Circuit Court, Beneficial argued at length, as set forth in the headnote to its first point, that according to the contract between Atlas and Beneficial, the latter became "the absolute assignee and title holder to the various securities and accounts receivable * * *; that the contract was not executory so far as [Atlas] was concerned, and therefore was not the subject matter of this Court's action in purporting to cancel the executory contract under the apparent authority of Section 116 of the Federal Bankruptcy Act."
The Circuit Court disagreed with Beneficial and affirmed the District Court. It said, in a brief per curiam opinion:
"It appearing that the written documents under which the conditional sales contracts here were transferred to appellant constituted appellant an agent only for collection of the contracts, we conclude that the trial court did not err in entering a summary turnover order. *529 A reading of the contracts under which Beneficial obtained possession of the property makes it plain that it had no adverse claim of title to the contracts that was more than colorable. As we stated in B.F. Avery & Sons Co. v. Davis, 5 Cir., 192 F.2d 255, quoted with approval in Spach, Trustee v. Fisher, 5 Cir., 310 F.2d 328, 330:
`Where a controversy arises as to whether there is such an adverse claim, the rule is that the referee can summarily enquire into it, and if it clearly appears that possession was in or for the bankrupt, and the adverse claim or right is only colorable, he may make a judgment accordingly; but if there be a possession before bankruptcy that was really adverse and asserted in good faith, the referee may not adjudge its merits, but the trustee must seek relief by a plenary suit.'
The order of the trial court is affirmed."
328 F.2d 55 (5 Cir. 1964).
Beneficial's petition to the Circuit Court for a rehearing, reciting that the opinion of that Court was "based upon a finding of fact and law which was not involved in the proceedings in the lower [District] Court, and counsel for the appellant has not had an opportunity to present to this Court any argument as to the facts of [sic] the law on this subject matter" was denied, as was Beneficial's petition for a writ of certiorari in the Supreme Court of the United States. 379 U.S. 827, 85 S.Ct. 55, 13 L.Ed.2d 36 (1964). In its application for certiorari Beneficial urged its claim of "title and ownership and purchase."
On March 25, 1964 the trustee instituted this action, asserting Beneficial's negligence in the collection of the receivables which were the subject of the Master Agreement, claiming a breach of warranty by defendant, urging a breach of fiduciary duty by Beneficial, and seeking an accounting and damages. In addition to asserting performance without negligence or breach of any duty, Beneficial reiterated as a defense its position that the Master Agreement constituted a purchase and sale, and counterclaimed for a declaratory judgment to that effect. Counterclaims by defendant seeking damages have since been abandoned.
Atlas was subsequently joined as a party plaintiff.
Beneficial now moves for summary judgment on the ground that the trustee's rejection of the contract in the District Court constitutes an election of remedy barring the action *530 sub judice. Its companion motion for judgment of dismissal on the ground of estoppel was withdrawn after oral argument, without prejudice to its renewal hereafter.
Atlas counters with a motion seeking an adjudication that defendant is collaterally estopped, by the determination of the United States District Court on the trustee's petition to reject the contract as executory, from asserting its position that the transaction was a purchase and sale. In effect, this motion is tantamount to a motion for summary judgment seeking a dismissal of the defendant's counterclaim pursuant to R.R. 4:58-2, and it is here so treated.

I
We shall consider first defendant's motion for a summary judgment charging plaintiffs with an election of remedies fatal to maintenance of the action here.
The suggestion is made that inasmuch as the November 9 agreement is expressly subject to the law of Florida, and since the subsequent contracts specifically adverted to that agreement, we must examine Florida law in our exploration of the problems presented. This postulate is not beyond challenge. Questions relating to breach, rescission and repudiation are generally determined by the lex loci contractus. Cockrell v. McKenna, 104 N.J.L. 592 (E. & A. 1928); Leonard v. Auto Parks, Inc., 12 N.J. Super. 113 (App. Div. 1951). On the other hand, matters of procedure are governed by the law of the forum. Marshall v. Geo. M. Brewster & Son, Inc., 37 N.J. 176 (1962); Dennison v. Dennison, 98 N.J. Eq. 230 (Ch. 1925), affirmed 99 N.J. Eq. 883 (E. & A. 1926). The equitable doctrine of election of remedies is said to be not a rule of substantive law, but rather a technical rule of procedure or judicial administration. Dial Press, Inc. v. Phillips, 23 N.J. Super. 543, 548 (App. Div. 1952), certification denied 12 N.J. 248 (1953); 25 Am. Jur.2d § 1, p. 647. In a jurisdiction where public policy will subvert a contract valid where made, it is inevitable that an *531 equitable doctrine such as election of remedies will, in any event, remain burdened by the jurisprudence of that forum. See Lobek v. Gross, 2 N.J. 100 (1949).
This dilemma need not intrude itself here. The factual circumstances of this case seem unique, and an identical or substantially similar case in either Florida or New Jersey has not been brought to our attention. Furthermore, it appears that basic contract law and the application of general contract principles are consistently similar in both states.
The defendant asserts that rejection by the trustee is tantamount to rescission and points to a large volume of law holding that rescission and damages for breach are inconsistent remedies. Lizak v. Rottenbucher, 140 N.J. Eq. 76 (Ch. 1947); Albert v. Kopplin Molding Corporation, 247 F.2d 107 (8 Cir. 1957); Owens v. Smith, 154 So.2d 878 (Fla. D. Ct. App. 1963). Cf. Van Buren v. Fine, 101 N.J. Eq. 373 (Ch. 1927), affirmed 103 N.J. Eq. 327 (E. & A. 1928). It further urges that In re Pagliaro, 99 F. Supp. 548 (N.D. Cal. 1951), affirmed sub nom. Costello v. Golden, 196 F.2d 1017 (9 Cir. 1952), should control.
Plaintiffs argue that this statutorily sanctioned rejection is not a rescission at all. They suggest that rescission requires the availability of return to status quo ante. Macfadden v. Macfadden, 49 N.J. Super. 356 (App. Div. 1958); Driscoll v. Burlington-Bristol Bridge Co., 28 N.J. Super 1 (App. Div. 1953); N.Y. Life Insurance Co. v. Weiss, 133 N.J. Eq. 375 (E. & A. 1943); Howell v. Baker, 106 N.J. Eq. 434 (Ch. 1930). They point out, correctly, that such a return here is a practical impossibility. On the ostensible authority of Tobin v. Plein, 301 F.2d 378 (2 Cir. 1962), they urge that breaches occurring prior to the rejection are actionable.
Rejection pursuant to 11 U.S.C.A. § 516(1) is sui generis. The attaching of any label, including rescission, is unavailing.
Consideration regarding election of remedies problems inevitably requires close factual scrutiny. 28 C.J.S. Election of Remedies § 1, p. 1059. Every case must be governed by its *532 own facts; there is no ironclad rule. Harris v. Louisville & N.R. Co., 237 Ala. 366, 186 So. 771 (Sup. Ct. 1939). Factual distinctions alone destroy much of the asserted impact of In re Pagliaro, supra, and Tobin v. Plein, supra.
In Pagliaro a bankrupt restaurateur had been purchasing certain furniture and fixtures pursuant to the terms of a conditional sales contract at the time of the filing of his voluntary petition in bankruptcy. He thereupon turned the property over to his vendor who resold it, crediting the bankrupt with the full amount due on the purchase price and pocketing the balance. The trustee secured an order from the referee in bankruptcy directing the vendor to turn over to him this balance, on the theory that the property in the furniture and fixtures passed to the Bankruptcy Court, and that the conditional vendor had no right to take the property without permission of the court, irrespective of the fact that he had the consent of the bankrupt. The United States District Court, affirmed by the Circuit Court of Appeals, reversed the Referee's determination, invoking section 70 (b) of the Bankruptcy Act, 11 U.S.C.A. § 110(b). This section provides that executory contracts not assumed or rejected by the trustee within 60 days after the adjudication of the bankruptcy shall be deemed to be rejected. The court held that since the trustee did not assume this contract which the court found to be executory, he did in fact reject it by operation of law, whereby the conditional vendor had title to the property. The factual distinctions are immediately apparent. Pagliaro concerned itself with a single transaction completely executory in nature, with title to a conditionally sold chattel reserved in the vendor for security purposes. Rejection by the trustee resulted in the perfection of title to the property in the vendor, a far cry from the Atlas-Beneficial situation. At least in equity, the return of the fixtures with a contemporaneous cancellation of the obligation to pay the balance due left both parties essentially in statu quo. Any equity the vendee had in the fixtures might well have been said to accommodate the rental value of the fixtures during the time he had their use.
*533 Tobin v. Plein also involved consideration of section 70(b) of the Bankruptcy Act. There the trustee petitioned the referee in bankruptcy for leave to commence arbitration against one Plein pursuant to an arbitration clause contained in a contract executed prior to the bankruptcy. This order was granted. Plein moved before the referee to vacate the order on the basis that the trustee had failed to affirm the contract within the 60-day period specified by section 70(b), wherefore he was deemed to have rejected the contract and, consequently, barred from suing on it. The referee refused to grant Plein this relief, and was reversed by the District Court. The Circuit Court in turn reversed the District Court and ordered the arbitration. It reasoned that if the contract was in fact breached, section 70(b) was not applicable because, following such breach, the contract was no longer executory. It noted that determination of the fact of breach required the arbitration proceedings. Again, the factual distinctions are at once obvious. Plein and a third party each owned 50% of the stock in the bankrupt. The contract in question was effected for the purpose of liquidating the bankrupt. The demand for arbitration demonstrated the trustee's conviction that Plein had endeavored to frustrate such a liquidation by such devices as diversion of money by Plein from the bankrupt, collection of money by Plein from debtors of the bankrupt contrary to the contract, loans to Plein by the bankrupt, and the conversion of the bankrupt's property, all prior to the bankruptcy. In fact, the Circuit Court suggests that these acts of Plein "appear to have been the cause of the institution of the proceedings which led to the bankruptcy adjudication." 301 F.2d, at p. 381.
Apart from this factual distinction, defendant argues that the significant portion of the opinion on which the plaintiffs rely is dictum. While this is so, the statements as they appear are worthy of some note:
"In the first place it appears that the alleged acts in breach of the contract of September 18, 1959, occurred prior to the adjudication of bankruptcy. [Footnote omitted]. If so, the trustee can maintain these *534 proceedings under the contract, whatever the effect of § 70b on any further rights. For the trustee's failure to assume a contract under the statute would not relieve the bankrupt of obligations created by a breach committed before bankruptcy or by the fact of bankruptcy itself. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811. In like fashion any rights of action accruing to the trustee by virtue of prior acts in breach of such a contract should not be affected by the trustee's election or rejection under § 70b." 301 F.2d, at p. 381.
In passing, we note that the Central Trust Co. case does not appear to support this proposition.
The particular factual situation in the matter sub judice defies a traditional or historical definition. The contracts in question anticipated an effort toward collection of more than 168,000 individual claims. These claims aggregated an amount greater than 20 million dollars. In accordance with the contracts, Beneficial had collected from five to six million dollars, and had remitted 75% of this to the institutional creditors of Atlas, retaining the balance as its commission. With respect to these remittances, there was nothing more to be done: the contract was fully executed. As to the uncollected paper, the contract was executory. As plaintiffs point out, a return to status quo ante was, by virtue of the very nature of the commercial instruments, obviously impossible.
To this singular set of circumstances in the unique bankruptcy procedure no label equation will suffice. The answer must be found by application to this problem of fundamental philosophies and policies, rather than by an application of results previously reached on entirely different factual situations.
The complete defense afforded by the equitable doctrine of election of remedies is recognized and enforced in appropriate situations in New Jersey. Ajamian v. Schlanger, 14 N.J. 483 (1954). However, it has been characterized "`a harsh and now largely obsolete rule,' [and] one to be strictly confined within its reason and spirit." Adams v. Camden Safe Deposit & Trust Co., 121 N.J.L. 389, 397 (Sup. Ct. 1938); Schrage v. Liebstein, 16 N.J. Super. 384, 389 (App. *535 Div. 1951), certification denied sub nom. Liebstein v. Schrage, 8 N.J. 431 (1952); Murphy v. Morris, 12 N.J. Super. 544, 548 (Ch. 1951).
"Commonly, criticism has come in the form of statements that the rule is a harsh one, that it is disfavored in equity, that it should not be lightly enforced, and that it should not be unduly extended, or, alternately, that it must be strictly confined within its reason and spirit. It is stated also that the doctrine is now largely obsolete in that modern procedural rules appear to have the effect of decreasing its applicability and scope." 25 Am. Jur.2d § 3, pp. 648-649.
The considerations which should apply, and to which effect will be given in the proper circumstance, may best be framed in terms of inconsistency of claims and duplicity of remedy. A party will not be permitted to carry water on both shoulders. Nor will he be permitted twice to recover for the same harm. A typical example may be found in the case where specific performance, inferring a valid contract, is sought on one hand, and damages resulting from an alleged fraud, charging the contract with an inherent debility fatal from the inception, are sought on the other. Obviously, a contract cannot be entirely valid at the same time in which it is entirely void ab initio.
Traditionally the courts have criticized inconsistent claims by a party in terms of condemning those who both approbate and reprobate. Tremarco v. Tremarco, 117 N.J. Eq. 50, 51 (E. & A. 1934); Blum Building Co. v. Ingersoll, 99 N.J. Eq. 563, 568 (Ch. 1926), affirmed 101 N.J. Eq. 291 (E. & A. 1927); Murphy v. Morris, supra, 12 N.J. Super., at p. 547; Lizak v. Rottenbucher, supra, 140 N.J. Eq., p. 81. The precise proscription of this historical rote was well defined in American Process Co. v. Florida White Pressed Brick Co., 56 Fla. 116, 47 So. 942 (Sup. Ct. 1908):
"If the allegations of facts necessary to support one remedy are substantially inconsistent with those necessary to support the other, then the adoption of one remedy waives the right to the other. A party will not be permitted to enforce wholly inconsistent demands respecting the same right. It is not permissible to both approbate and reprobate in asserting the same right in the courts." (at p. 944; Emphasis supplied)
*536 Or, as sharply put in Taylor v. Robertson Petroleum Co., 156 Kan. 822, 137 P.2d 150 (Sup. Ct. 1943):
"To make actions inconsistent one action must allege what the other denies, or the allegation in one must necessarily repudiate or be repugnant to the other." (at p. 154)
As against duplicity of remedy, the defense of election of remedies exists if there are (1) the existence of two or more remedies, (2) inconsistency between these remedies, and (3) the conscious choice of one of them. Levy v. Massachusetts Accident Co., 127 N.J. Eq. 49 (E. & A. 1940); Schrage v. Liebstein and Murphy v. Morris, both supra. The absence of any one of these prerequisites frustrates the defense.
Applying either the conceptual doctrine of the approbation-reprobation rule or the rigid injunction of the three-pronged formula set forth immediately above, it cannot be said that plaintiffs here in any sense elected a remedy in the bankruptcy proceedings below.
We first examine the matter from the viewpoint of whether approbation and reprobation did in fact here exist. Far from asserting inconsistent positions, plaintiffs made their present complaints against defendant very apparent in the bankruptcy proceedings. The most gracious of their accusations in this regard was the statement in the trustee's petition that Beneficial was not exercising its best efforts in the collection of Atlas paper remaining in its hands. It is also notable that at no place and at no time did plaintiffs contest the validity of these agreements, nor urge that they were not bound by the contracts. To the contrary, they acknowledged their susceptibility to the strengths and weaknesses of the agreements by the very act of filing the petition. This is in no way analogous to a plaintiff who charges fraud and seeks rescission, and in the same breath asks for specific performance or for damages. This does no violence to the rule that a party will not be heard to contradict himself. See Knight v. Electric Household Utilities Corp., 133 N.J. Eq. 87 (Ch. 1943), affirmed 134 N.J. Eq. 542 (E. & A. 1944).
*537 It is true that plaintiffs availed themselves of a statutory remedy to foreshorten the damages they believed to be occurring by virtue of defendant's conduct. This is not a disaffirmance of the contract or, in defendant's words, a rescission. The seeking of affirmative relief by a special provision of the federal statutes which offer such relief to those in plaintiffs' position is an acknowledgment of all the contractual sanctions rather than a denial. It cannot in any wise be said to consist of approbation and reprobation. The benefits of legislatively granted extraordinary relief to bankrupts and their trustees must not be limited by the application of "a harsh and now largely obsolete rule." Beyond the inequitable result in the present case, tolerance of such an eroding process might soon enervate the beneficent policy of our bankruptcy statutes.
We turn to the tripartite formula. It is doubtful whether here two or more remedies did in fact exist. There is no suggestion that defendant was amenable to the jurisdiction of the Bankruptcy Court in an action for damages there. Defendant argues, on the other hand, that the existence of a "second" remedy is demonstrated by the action here. As said in Hiers v. Hiers, 132 N.J. Eq. 610 (E. & A. 1943):
"The two proceedings * * * are so different in their nature and in the relief that may be given and in the object to be attained, as well as in the matters of fact that enter into the determination, that it cannot be said there was an election of remedies * * *." (at p. 612)
A corollary to defendant's argument of a second remedy imposes upon plaintiffs an inequitable and unjust burden: in the face of continuing losses of the magnitude asserted by plaintiffs, they must choose between a right to terminate further loss by absorption to their detriment of prior losses, or they must permit the economic waste of the remaining potential in the commercial paper by letting precious time go by while they seek to establish damages. A court of conscience cannot allow this.
Even if it were to be said that statutory rejection and an action for damages constitute separate remedies, there appears *538 to be no real inconsistency in the combination of these approaches. As with the proscription of the approbation-reprobation rule, the test to determine inconsistency as between remedies is generally applied to the claims asserted or the facts on which such claims are based. Knight v. Electric Household Utilities Corp., supra.
"It has been said that the so-called `inconsistency of remedies' is not in reality an inconsistency between the remedies themselves, but must be taken to mean that a certain state of facts relied on as the basis of a certain remedy is inconsistent with, and repugnant to, another certain state of facts relied on as the basis of another remedy. For one proceeding to be a bar to another for inconsistency, the remedies must proceed from opposite and irreconcilable claims of right and must be so inconsistent that a party could not logically assume to follow one without renouncing the other." 25 Am. Jur.2d § 11, p. 653.
As noted above, plaintiffs did not deny, in the bankruptcy proceedings, the existence of a contract with defendant, with all its obligations and benefits. Nor do they here. They asserted in the bankruptcy proceedings improper conduct on the part of defendant. This is their position here. They alleged in the bankruptcy proceedings a continuing harm. They charge that harm here and seek damages for it. The interdiction against irreconcilable and repugnant positions, said in Adams v. Camden Safe Deposit & Trust Co., supra, 121 N.J.L., at pp. 394-395, to be the principle underlying the reason for the election of remedies doctrine, is not violated. Consistency, rather than inconsistency, appears to be the watchword. The conviction that cumulative remedies, rather than disparate ones, have been invoked is inescapable. A concurrence of remedies, as contrasted to an inconsistency, is not condemned. Nazzaro v. Globe & Republic Ins. Co., 127 N.J. Eq. 279 (E. & A. 1940); Adams v. Camden Safe Deposit & Trust Co., supra; 25 Am. Jur.2d § 12, p. 654.
Finally, even assuming the availability of two remedies, it is difficult in equity to charge plaintiffs with a choice of these remedies when, in the real sense of the word, no "choice" was available. Defendant insists the rejection was *539 truly a rescission. But a rescission contemplates a return to status quo ante, a practical impossibility here. Rejection did not afford such relief. Defendant was apparently unavailable within the jurisdiction of the bankruptcy proceedings in an action for damages. A whole remedy was not available, in reality, except in the manner now under attack.
A similar problem was considered in Chester-Neal Company v. Generazzo, 20 N.J. Misc. 296, 26 A.2d 876 (C.P. 1942). There plaintiff loaned money to defendant on defendant's false representation that he had no outstanding indebtedness. Defendant made no payments on his obligation for over a year, whereupon plaintiff sued him on his note and recovered judgment. Thereafter, defendant was adjudicated a bankrupt. Although plaintiff was scheduled as a judgment creditor, he did not participate in the bankruptcy proceedings. Ultimately, defendant was discharged in bankruptcy. Plaintiff again sued defendant, this time in tort for his false representations. The court held that neither the previous suit on the note, nor the discharge in bankruptcy, was a bar to this action. The following appears:
"Since plaintiff's judgment was taken on this action on the note, in which defendant's fraud was not, and could not have been an issue, plaintiff would have been barred in the bankruptcy proceedings from proving defendant's fraudulent representations, even had he sought to do so, in order to except his then claim from the bar of the bankruptcy discharge." (at p. 298)
To sustain defendant's argument would be in effect to require of plaintiffs, not a choice between remedies, but rather the selection of one or the other of two in a situation where neither one alone could provide complete redress. Defendant cannot here invoke the harsh and now largely obsolete rule of election of remedies to produce such a harsh and inequitable result.
Viewed from the heights of equity, plaintiffs have been consistent in their positions and have sought cumulative assistance from the available courts. They ought not to be relegated to half a loaf without at least a full opportunity to prove their factual claims.
*540 "The rule of election of remedies is technical; it should not be applied so as to sacrifice substantial rights to supposed legal consistency." Dial Press, Inc. v. Phillips, supra, 23 N.J. Super., at p. 551.
Defendant's motion for summary judgment is denied.

II
We turn to plaintiffs' motion urging that defendant is collaterally estopped from his assertion that the transaction involved constituted a sale with title fully vested in defendant.
Although the pretrial memorandum deals with this problem both in terms of res judicata and collateral estoppel, it was conceded on oral argument, and it appears clear, that the doctrine of res judicata is not apposite. As pointed out in Brick Township Ocean County v. Vannell, 55 N.J. Super. 583 (App. Div. 1959), assertion of this doctrine requires, inter alia, a demonstration of an identity of causes of action in the former and subsequent suits. This prerequisite is lacking here. For plaintiffs to succeed on their motion, foundation must be laid for the doctrine of collateral estoppel, sometimes called estoppel by judgment.
The circumstances under which the doctrine should be applied are succinctly stated in Restatement, Judgments, § 68, p. 293 (1942):
"(1). Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action, * * *."
Conversely, the second paragraph of the same section notes:
"(2). A judgment on one cause of action is not conclusive in a subsequent action on a different cause of action as to questions of fact not actually litigated and determined in the first action."
The rule as thus defined has vitality in our courts. Washington Township v. Gould, 39 N.J. 527 (1963); New Jersey Highway Authority v. Renner, 18 N.J. 485 (1955); *541 Brick Township, Ocean County v. Vannell, supra. Its policy is supported by pronouncement of the Supreme Court of the United States. Southern Pacific Railroad Company v. United States, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897). Cf. United States v. Munsingwear, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). The fact that the prior determination was one in the course of bankruptcy proceedings does not corrupt the policy nor abrogate the rule. Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938).
Counsel for defendant agreed on oral argument that if the issue involved was argued in the Florida proceedings, was necessary to a determination thereof, and was in fact decided, such a determination does estop the parties from relitigating the issue in the action here. He argues, however, at length, citing numerous cases to support the proposition, that neither "collateral" or "incidental" or "incidentally cognizable" issues, nor matter to be inferred from the judgment, may form the basis for estoppel by judgment. The thrust of his argument converges upon his sound insistence that the summary proceeding permitted by section 116(1) of the Federal Bankruptcy Act does not afford the opportunity for either of the parties to argue or for the court to determine what relationship evolved from the complicated contract documents into which the parties entered. He concludes thereby that any apparent determination of the nature of this relationship lacks evidential support, and that colloquy or inference cannot provide structural steel for such a castle of sand.
Defendant's argument is correctly related as is to be seen by the following statement appearing in its brief:
"The real issue in the present suit [i.e., the motion] is (a) whether the comments relating to agency included in the colloquy of the Summary Proceedings Court constitute an adjudicated factual finding of that court, (b) whether this alleged factual determination relating to agency was the legal basis and direct cause of the Court's order permitting rejection of the master agreement, (c) whether the remarks were merely incidental and collateral comments by the court, and (d) whether the court did in fact rule that defendant was the agent of Atlas Sewing Centers, Inc."
*542 Thus postulated, the argument misconceives the purport of plaintiffs' motion. While plaintiffs would unquestionably welcome a determination by this court to the effect that Beneficial is estopped from denying that it was an agent for Atlas, their only suggestion in this direction is confined to one statement of the District Court at the close of testimony on the hearing of the trustee's petition. Plaintiffs' real effort is directed toward a declaration of estoppel against Beneficial forbidding its assertion that the contract in question constituted a purchase and sale. Faced as they are with defendant's counterclaim seeking a declaratory judgment in this court that the contractual arrangements "vested in it [Beneficial] full and absolute title to the said notes and other instruments free of obligation of any kind whatsoever to Atlas or to [the trustee]," plaintiffs are not insisting upon acceptance here of what the District Court said the relationship was, but rather of what the District Court said the relationship was not. So put, we concur in plaintiffs' view.
Jurisdiction for the petition to reject filed by the trustee in this matter, is to be found in 11 U.S.C.A. 516:
"Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in the chapter conferred and imposed upon him and the court 
(1) permit the rejection of executory contracts of the debtor, * * * upon notice to the parties to such contracts * * *."
In proceedings in bankruptcy, such as the trustee's petition here, the judge (or referee) can summarily inquire into the situation, and if it clearly appears that the adverse claim or right is only colorable, he may make a judgment accordingly. If there is, on the other hand, possession by another before bankruptcy that was really adverse and asserted in good faith, the referee may not adjudge its merits, but the trustee must seek relief in a plenary suit. Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944); 2 Collier on Bankruptcy 519, § 23.07.
It follows that a necessary issue in the District Court proceedings on the trustee's petition was whether Beneficial's *543 claim was "merely colorable." Such an issue was argued at length, defendant framing the issue in terms of the court's jurisdiction to grant the trustee's petition. The District Court held it was not more than a colorable claim, and proceeded to permit rejection in the summary proceeding. As noted, the Circuit Court of Appeals affirmed and the Supreme Court denied certiorari.
It is obvious that such a conclusion required a finding that the transaction did not constitute a purchase and sale. "Colorable" is defined in Black's Law Dictionary (4th ed., 1951), p. 332, as "That which is in appearance only, and not in reality, what it purports to be. Counterfeit, feigned * * *." Clearly a purchase and sale, even if executory, would amount to title beyond something merely colorable as thus defined. The District Court's determination, affirmed as it was, concluded once and for all the fact that Beneficial's claim did not extend that far.
Collateral estoppel is particularly appropriate.
"It is well-settled that where a judgment of a court of competent jurisdiction directly determines a right, question or fact distinctly put in issue, such judgment estops the parties or their privies from thereafter relitigating the same issue in a subsequent proceeding between them, regardless of its nature or form." Washington Township v. Gould, supra, 39 N.J., at p. 533
Accordingly, the defendant's counterclaim is dismissed.
It should be particularly observed, however, that the determination on this motion extends no further than to estop defendant from asserting that the transactions involved constituted a purchase and sale. While the per curiam opinion of the Court of Appeals suggests that Beneficial was "an agent only for collection of the contracts," the determination of the District Court judge as reflected in the order he entered permitting the trustee to reject the executory contract, and from which appeal was taken, was silent in this regard. In any event, a review of the entire record of the proceedings upon *544 this petition, marked in evidence on the hearing of this motion, reveals that beyond the negating of a purchase and sale, the relationships which resulted from these contract instruments were not fully explored and were not determined.
Such a determination was not necessary to the resolution of the ultimate question as to whether Beneficial's claim was more than colorable. Defendant properly urges that it is not estopped from further litigation toward the end of establishing the resultant relationships short of purchase and sale. Restatement; Judgments § 68(2), supra.

III
At oral argument, in connection with a motion directed toward certain anticipated evidentiary questions relating to proof of damages, plaintiffs urged a novel suggestion in connection with proof of defendant's negligence. Their thesis, simply stated, was that expert proof should be accepted, in the form of opinion testimony, to show what return might be reasonably anticipated on the whole bulk of the commercial paper assigned to Beneficial. They argue that subsequent proof showing a lesser return should be accepted as some proof of Beneficial's negligence. It is clear that this was not offered as a substitute for proving damages, but rather as a link in the chain forged to constitute a prima facie demonstration of defendant's alleged negligence.
The parties were given an opportunity to supplement their briefs after the hearing to consider this approach. No direct authority for or against the proposition was submitted, nor have we found any.
Plaintiffs argue from analogy to (a) the duty of a bank to act "seasonably" with respect to collections as imposed by the Uniform Commercial Code, and (b) the duties of a trustee who, as they point out, may not sit idly by while securities depreciate.
Defendant's duty here was imposed by contract. An analogy between the duties thus created and statutorily imposed banking *545 obligations or those imposed by a combination of statute and case law and the expressed will of a testator or settlor of a trust, appears overdrawn. More appropriate would seem to be the suggestion that the death of a patient on the operating table is some evidence of the negligence of the surgeon. This, of course, is not the law. Schueler v. Strelinger, 43 N.J. 330 (1964).
An offer of evidence of the dimension plaintiffs propose for the avowed purpose will be rejected.