CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review, pursuant to N.J.S.A. 54:3-21, of the 1981 assessment on its property located at 175 Prospect Street, East Orange, New Jersey (Block 651, Lot 3). Plaintiff looks for a reduction in the assessment in accordance with the true value of the property, as adjusted by the application of Chapter 123. L.1973, c. 123. Defendant seeks an increase in the assessment in accordance with its proofs of true value, modified by the application of the appropriate ratio.
The assessment was:
Land $ 310,700
Improvements 2,380,500
Total $2,691,200
At issue are the true value of the subject property, plaintiff’s entitlement to statutory relief from a discriminatory assessment pursuant to Chapter 123, defendant’s entitlement to an increased assessment notwithstanding its failure to file a counterclaim, and whether plaintiff is entitled to the benefit of the *15 Freeze Act, N.J.S.A. 54:3-26, by reason of an unappealed 1980 county board judgment.
The subject of the controversy is a so-called luxury high-rise apartment building, 23 stories in height, which contains 227 rentable apartment units composed of the following:
35 Studios
146 1 bedroom, 1 bath
34 2 bedroom, 2 bath
12 3 bedroom, 2 bath
227
The structure, which is sited on 2.65 acres of land, was built in 1964 with the aid of FHA financing. It is of brick and concrete construction and contains three 2,000 pound elevators, a roof-mounted steam absorption unit, two oil-fired hot water boilers and its own incinerator system. Interior hallways throughout the building are carpeted. Each dwelling unit is supplied with range and oven with exhaust hood and a refrigerator. One hundred and fifty-six units have automatic dishwashers. The building also has a full basement including a laundry area with washing and drying machines. Amenities include a handball court, a tennis court and a swimming pool. There are also doormen on duty 24 hours, guard service and a closed-circuit television system of surveillance for security purposes. Finally, the building has an underground two-level parking garage with spaces for 238 automobiles. Some six to ten of those spaces are not usable because of a leak in the garage roof.
The tenants are on one-year leases and the landlord supplies heat and all utilities.
The property enjoys good proximity to public transportation; it is a “short stroll” to the Brick Church station of the Delaware & Lackawanna Railroad, only 40 minutes from midtown Manhattan.
The immediate neighborhood has suffered significant deterioration, as evidenced by abandoned single and multi-family buildings. The structure directly across the street from the subject, *16 a former two- or three-family dwelling, is vacant and boarded up and appears to be in a deplorable condition.
Until June 12,1980 rents in the subject property were subject to the East Orange rent control ordinance. On that date, however, local rent control was preempted by the United States Department of Housing and Urban Development (HUD), which authorized an increase in apartment rents to an aggregate level of $1,273,887 per annum. In addition, HUD authorized increases in monthly parking fees to an aggregate level of $127,440.
HUD directed plaintiff to prepare a schedule implementing the authorized increases, identifying each apartment and the rents to be charged, upon the expiration of current leases, to bring the total rent potential up to the approved potential rent level. Plaintiff was also required to post the schedule for the tenants’ inspection.' This posting, which occurred on or about October 1, 1980, generated a storm of protest from many tenants, who came in a steady stream to the office of the building’s management to complain. Apartment vacancies which increased immediately after the rent schedule was posted, averaged approximately $78,815, when measured in terms of revenues, throughout 1981. The average number of vacant apartments during that year was 13. The vacancy rate, whether calculated in terms of revenue shortfall from total rent potential of $1,273,887, or in relation to the total number of apartments, was approximately 6%. The actual vacancy rate for 1980, measured by number of apartment vacancies, was less than 2%.
Contract rents for all apartment units were $975,000 in 1977, $977,310 in 1978 and $995,000 in 1979.
On or about October 1, 1980 the rents charged for 99 apartments were increased 25%. Thereafter, and upon expiration of leases on the remaining apartments, rents were increased by anywhere from 6% to 25%.
Plaintiff’s managing agents claimed an inability to achieve the HUD preemption level of rents with respect to the 118 leases negotiated after October 1,1980. They concede, however, *17 that management’s concessions were, for the most part, confined to the fees paid for parking spaces.
Notwithstanding management’s claimed inability to achieve the level of rents mandated by the HUD preemption, plaintiff’s project manager, in a letter to HUD-Newark dated August 6, 1980, declared his intention to implement the preemption level in full immediately with respect to new tenants and in two annual increments in the case of existing tenants, who would receive a maximum increase of 25% in the first year.
The parking garage was plagued with substantial vacancies. On or about October 1, 1980 15 spaces were not leased and an additional 6 to 10 spaces were not usable by reason of leaks in the garage roof. Moreover, the rents charged by plaintiff for parking space were negotiated with tenants on an individual basis and plaintiff was unable, on the assessing date or thereafter, to achieve the HUD preemption level of $127,440 mandated for parking fees. The actual vacancy rate for the parking garage in 1980, expressed as revenue loss, was 20%.[1]
Plaintiff appealed the 1980 assessment on the subject property to the Essex County Board of Taxation, which entered judgment “for one year only” reducing the assessment to $2,274,400. This judgment was not appealed. The pretrial order in this case directed plaintiff to file an appropriate motion with this court, returnable on or before May 1,1982 addressed to the legal effect of the unappealed county board judgment. Plaintiff filed no such motion, either within the time prescribed or before the close of the proofs in this proceeding.
The true value estimates of the parties’ experts, and the analytical techniques which they utilized, are as follows:
*18 Plaintiff Defendant
True value $2,170,600 $3,243,000
Approaches to value Income Income
Economic rent $1,275,674[2] $1,408,987[3]
Vacancy rate 7.75% [4] 3%
Expenses $746,187 $749,000
Effective net income $431,747 $617,717
Capitalization technique Building residual Building residual/ band of investment
Capitalization rate 20.32% [5] 19.39% [6]
Effective capitalization 19.89% rate 19.05%
Plaintiff argues that the property’s contract rents were prima facie evidence of the economic rent and that defendant bears the burden of submitting contrary evidence, citing Park- *19 view Village Ass’n v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). Plaintiff’s expert, however, did not rely solely on the contract rents in estimating the economic rent for the apartments. Indeed, there is no evidence to show what those contract rents actually were. The October 1, 1980 rent rolls disclosed only the contract rents for the occupied apartments, not the rents assigned to the vacant units. Moreover, the wide variety of contract rents, many of which were the product of negotiations with the particular tenant, shows the lack of a uniform rental policy predicated upon size and floor location of the units. The rent rolls set forth in the expert’s appraisal show merely the contract rents attributable to each apartment. They indicate neither the size nor the floor location of the units.
Plaintiff’s expert posited an average rental of $420 per unit. He claimed that this figure was the result of his review of rent rolls for the three years prior to 1980 and his analysis of what transpired in 1981. He offered no enlightenment, however, on the relationship between his review and analysis and the average unit rental of $420.
Defendant’s expert, on the other hand, postulated an economic rent for the apartments equal to the HUD preemption level. His conclusion in this regard is amply supported by the credible evidence. Notwithstanding plaintiff’s vigorous denial of its ability to achieve the HUD preemption level, plaintiff’s project manager declared unequivocally, in a letter to HUD-Newark, his intention to increase the apartment rents to the prescribed level in two annual increments. This state of facts, and not merely the actual rents in effect on October 1, 1980, would be of paramount importance to the putative purchaser, who could reasonably expect an early, full implementation of the HUD preemption level by reason of the fact that all the leases were only one year in duration. The buyer is primarily concerned with the anticipated return on his investment. Parsippany Hills Assoc. v. Parsippany-Troy Hills, 1 N.J.Tax 120 (Tax Ct.1980). His expectation of future benefits is most assuredly not confined to the rents currently charged.
*20 Both experts are wide of the mark on the gross income potential of the parking garage. Plaintiff’s expert posited a rent level in excess of the amount permitted by HUD, while the assumption of defendant’s expert as to the number of parking spaces (270) is contradicted by the credible evidence which shows only 238. I find that the correct gross rent potential for the garage is the amount mandated by HUD in its preemption letter, namely, $127,440.
Concession income of $13,274, as posited by plaintiff’s expert, is supported by the evidence, whereas no record support can be adduced for defendant’s estimate of $9,100.
Plaintiff’s vacancy estimate of 5% for the apartments is more realistic than defendant’s 3%. An expert’s vacancy allowance should reflect the long-term quality and durability of the rental income stream. Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax Ct.1980); American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed.1978) 339. Plaintiff’s estimate takes into account the magnitude of the increases mandated by HUD, especially when compared to the relatively modest rent levels prevailing in prior years. It also considers the intensity and depth of tenant resistance manifested when the HUD preemption notice was posted. Finally, the vacancy allowance is validated by the actual vacancies in 1981, a condition reasonably foreseeable on the basis of facts existing on the assessing date, i.e., the protests lodged with plaintiff’s on-site management. Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax Ct.1981).
The appropriate vacancy allowance for the parking garage is 20%, a conclusion which I base on a comparison of actual parking revenues with the gross revenue potential reflected in the HUD preemption. I have also considered other evidence in the record indicating that the market for garage space in the subject building was soft. The proximity of the subject property to efficient rail transportation to New York City and the availability of public transportation to other destinations undoubtedly contributed to this soft market. Plaintiff’s financial *21 statements for prior years disclose substantial vacancies in garage rentals and thus lend additional support to my conclusion.
The experts differ insubstantially with regard to expenses. As the expenses posited by defendant’s expert include stabilization of several items, a technique which is supported by sound appraisal principles, I accept his expense estimate. The Appraisal of Real Estate, supra at 346-347.
The principal difference in the experts’ effective capitalization rates is found in their selection of the interest rate. They both agree on a 3% recapture, i.e., a return of capital, and the difference in land value for calculation purposes is minor. Defendant’s expert equalizes the land assessment by the Chapter 123 ratio, thereby grossing it up to $370,000, while plaintiff’s expert equates the land assessment with true value. I find, however, that the conclusion of defendant’s expert is a better reflection of the demands of the long-term investment market as revealed by the credible evidence. Accordingly, I find the appropriate overall capitalization rate to be 19.05% inclusive of the effective tax rate.
In view of the foregoing I find the true value of the subject property on October 1, 1980 to be $3,025,700, calculated under the income method as follows:
Gross rent potential-apartments $1,273,887
Less 5% vacancy allowance 33 70Q
Effective gross income— apartments $1,210,187
Gross rent potential-garage $127,440
Less 20% vacancy allowance 25.500
Effective gross income— Sarage $ 101,940
Add concession income 73 274
Total effective gross income $1,325,401
Less expenses 749,000
Effective net income $576,401
*22 Capitalized at 11.66% + 7.39% effective tax rate
True value (rounded) $3.025.700
Plaintiff is entitled to no discrimination relief. N.J.S.A. 54:2-40.4, effective for the year under review, provides in substance, that whenever this court finds that the ratio of the assessment to the property’s true value exceeds the upper limit of the common level range, the taxable value of the property shall be revised by applying the average ratio to the true value. The “common level range” is defined in N.J.S.A. 54:1-35a as that range which is plus or minus 15% of the average ratio for the taxing district. The average ratio of assessed to true value is the ratio promulgated by the Director, Division of Taxation for school aid purposes as of October 1 of the pretax, year. N.J.S.A. 54:1-35b instructs the Director, on or before April 1 in each year, to determine the average ratio and the common level range and to certify the same to the county boards, assessors and municipal clerks. The average ratio so certified by the Director for East Orange for tax year 1981 is 84%, and the common level range, also certified is 97% (upper) and 71% (lower). As the ratio of the assessment of the subject property to its true value, as hereinabove found, is 89%, which is comfortably within the common level range, no relief is available under N.J.S.A. 54:2-40.4, the portion of Chapter 123 applicable to proceedings in this court. For the same reason, defendant is entitled to no increase in the assessment. See Devonshire Development Assoc. v. Hackensack, 2 N.J.Tax 392, 184 N.J.Super. 371,446 A.2d 201 (Tax Ct.1981).
Plaintiff seeks to apply the Freeze Act, N.J.S.A. 54:3-26 to tax year 1981 by reason of the unappealed 1980 judgment of the Essex County Board of Taxation reducing the assessment on the subject property to $2,274,400. Plaintiff claims that the granting of such relief is not barred by the election of remedies doctrine, notwithstanding that the assessment for 1981, the first freeze year, was litigated to a conclusion. That doctrine, plaintiff avers, is a technical rule of procedure designed to aid *23 judicial administration through the avoidance of multiple litigation. Plaintiff argues further that N.J.S.A. 54:3-26 evidences the legislature’s intention to protect the taxpayer from the assessor; and, therefore, a doctrine designed to aid judicial administration should not be applied to deprive the taxpayer of protection specifically afforded by the legislature.
N.J.S.A. 54:3-26 declares, in substance, that an unappealed judgment of the county board of taxation fixing the assessment for a given year is binding and conclusive upon the taxing district and its assessor for that year and the two succeeding years, absent a change in value or district-wide revaluation. The act may be invoked at the exclusive option of the taxpayer. It is not available to municipalities or third parties. Hasbrouck Heights v. Tax Appeals Div., 41 N.J. 492, 197 A.2d 553 (1964); Eckardt v. Sisler Enterprises, 1 N.J.Tax 25 (Tax Ct.1980).
The doctrine of election of remedies applies where a party, having knowledge that a choice exists, is confronted with a choice of alternative and inconsistent remedies. Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 165 A.2d 543 (App.Div.1960), certif. den. 34 N.J. 66, 167 A.2d 55 (1961); Ray v. Beneficial Finance Co., 92 N.J.Super. 519, 224 A.2d 143 (Ch.Div. 1966). Here, plaintiff was aware of the choice between the Freeze Act and litigation on the merits of the 1981 assessment for some time prior to trial. Indeed, the pretrial order in this case in effect directed plaintiff to choose between litigating the 1981 assessment and applying the Freeze Act on the basis of the unappealed 1980 county board judgment. The Freeze Act remedy is inconsistent with pursuit of the remedy of a lower assessment through trial on the merits. Bloomfield v. Parkway Industrial Center, 3 N.J.Tax 220 (Tax Ct.1981).
Plaintiff made an unequivocal election to proceed to judgment on the merits. No motion was made to apply the Freeze Act in accordance with the pretrial order. Plaintiff’s failure to file such a motion was an election to seek the remedy of an assessment below the level of the unappealed 1980 county board *24 judgment and a waiver of the Freeze Act remedy. Bloomfield v. Parkway Industrial Center, supra.
In the alternative, assuming arguendo that plaintiff’s election was preserved notwithstanding its failure to file a pretrial motion, plaintiff could have withdrawn its complaint at any time prior to the close of the proofs in this case, thereupon moving for the application of the Freeze Act. R. 8:3-9. See Thomas v. Camden Trust Co., 59 N.J.Super. 142, 149, 157 A.2d 355 (Law Div.1959). Plaintiff rejected this course of action as well, choosing to litigate the 1981 assessment to its conclusion.
In view of the foregoing, I conclude that plaintiff is not entitled to the benefit of the Freeze Act.
In view of what has just been said it will not be necessary to address plaintiff’s claims with respect to the restrictive nature of the 1980 county board judgment providing, in effect, that the Freeze Act would not apply.
Judgment will be entered affirming the original assessment.

Consists of apartment rent potential of $1,123,920, parking rent potential of $138,480 and concession income of $13,274.

Consists of apartment rent potential of $1,273,887, parking rent potential of $126,000 and concession income of $9,100.

 Consists of 5% for apartments and 30% for garage, which become 7.75% on a weighted basis.

 10.25% interest, 3% recapture, 7.07% effective tax rate. Interest and tax components were applied to assessed value of land.

 9% interest, 3% recapture, 7.39% effective tax rate. Land assessment was equalized by application of Chapter 123 ratio (84%) for purposes of building residual calculation. The alternative overall rate of 19.05% was calculated under the band of investment technique in the following manner:
75% mortgage — 25 year payout @12.25%, constant — 12.86% 9.64%
25% equity @8.1% 2.02%
Effective tax rate 7.39%
19.05%