CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of the 1984 assessment on its property located at 1143-1157 Kennedy Boulevard, Bayonne, New Jersey (Block 46-53, Lots A, B & C). That assessment was:
Land $835,000
Improvements 215,000
$1,050,000 Total
At issue are the true value of the subject property and whether plaintiff is entitled to relief from assessment discrimination pursuant to N.J.S.A. 54:51A-6, commonly referred to as chapter 123.
The subject of the controversy is a three-story brick 216-unit garden apartment complex situated on 6.41 acres of land, generally well-maintained and with convenient access to public transportation and to major highways leading to nearby large metropolitan communities. The amenities include open parking on the premises, substantial landscaping and laundry facilities on a concession basis. There are no garages.
*385 The building was constructed about 35 years prior to the assessing date and consists of brick veneer over exterior masonry walls, interior wood-frame construction, asphalt shingle roofs, aluminum gutters and leaders, steel fire escapes, steel double-hung sash with aluminum screens only and wood entrances. Heat and hot water are supplied by dual-fired hot water boilers and separate gas-fired hot water heaters.
The owner provides heat and hot water and a stove and refrigerator in each apartment. Gas and electricity service in the apartments are paid by the tenants.
At all times pertinent hereto, a rent-control ordinance was in effect in the defendant municipality. Under that ordinance the landlord, upon application to the rent-control board, was permitted an annual rent increase for each apartment in an amount equal to the lesser of 5.5% or the change in the consumer price index (CPI) from the inception of the lease to a date 60 days prior to its termination or expiration. The ordinance also provided for hardship and capital improvement increases.
All leases in the subject property were for one year or less.
Both experts relied solely on the economic approach to value. Their respective true value estimates and the manner in which the estimates were developed are shown in the following tabular form:
Plaintiff Defendant
Economic rent $790,639 $815,670[1]
Vacancy & collection loss (23,719) (3%) (16,313) (2%)
Adjusted rental income 766,920
Laundry commissions 4,860
Miscellaneous income 1,000
Effective gross income 772,780 799,357
Expenses:
Insurance 14,780 7,000
*386 Plaintiff Defendant
Electric & gas (incl. fuel) 182,285 170,000
Water & sewer 16,112 16,200
Wages & payroll taxes 72,017 71,300
Maintenance & repairs 80,000 40,000
Painting 17,870 11,000
Reserves for replacements 10,260 5,200
Management 38,350 40,000
Professional fees & mise. 5,000 —
Supplies — 5,000
Landscaping & ground maintenance — 15,000
Total expenses $436,674 $380,700
Effective net income 336,106 418,657
Capitalization rate 17.26% 15.5%
True value (rounded) $1,950,000 $2,700,000
The most critical difference between the experts lies in their estimate of economic rent. Both experts annualized the October 1, 1983 rent rolls. Plaintiffs expert posited that annualization as his tax year gross rental income, while defendant’s expert grossed up the annualization by 2x/2% to reflect what he believed to be the reasonable expectation of the putative purchaser of the rent level prevailing in the tax year by virtue of the minimum rent increases allowable under the rent-control ordinance.
I find the economic rent to be $810,000 (exclusive of laundry and miscellaneous income), the level posited by defendant’s expert. The latter’s adjustment reflects the inevitable increases allowable under the defendant’s rent-control ordinance. The expert’s reliance upon CPI changes is documented by the actual changes as reported in The Appraiser magazine *387 for the years 1981 to 1983. While those changes all exceeded 2.5%, the expert’s choice of that figure reflects the fact that leases are renewed at various times throughout the year.
Post-assessing date events may be probative of true value where they are reasonably foreseeable on the assessing date. Fort Lee v. Invesco Holding Corp. 3 N.J.Tax 332 (Tax Ct.1981), aff’d 6 N.J.Tax 255 (App.Div.1983), certif. den. 94 N.J. 606, 468 A.2d 238 (1983); Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316 (Tax Ct.1984). The purchaser is primarily concerned with the anticipated return on his investment; and his expectation of future benefits is most certainly not confined to the rents currently charged. Parsippany Hills Assoc. v. Parsippany-Troy Hills Tp., 1 N.J.Tax 120 (Tax Ct.1980); Berenson v. East Orange, 6 N.J.Tax 12 (Tax Ct.1983), aff’d o.b. per curiam 6 N.J.Tax 493 (App.Div.1984).
The remaining differences involve the proper vacancy allowance, some of the expenses and the appropriate capitalization rate.
The 3% vacancy allowance posited by plaintiff’s expert is based upon his own experience as manager of the subject property and his knowledge of the actual vacancies and losses occurring therein over several years. Defendant’s expert posited his 2% vacancy allowance on the recent history of occupancies within defendant taxing district. Plaintiff’s expert’s conclusion is predicated on specific data respecting the subject property and is thus more persuasive. I find the appropriate vacancy and collection loss allowance to be 3%.
The expenses posited by plaintiffs expert are all founded on hard data and upon his extensive experience as manager not only of the subject property but of many other large apartment complexes. His explanation of the upward adjustment made for insurance expense was eminently sound and the other expenses which he used were either the actual expenses of the property or were applications of expense levels prevailing in other apartment complexes similar in size and age to the subject. His prolix documentation of expense ranges reflected *388 in a survey of 159,929 apartments contained in 1,036 buildings built in the 1960s amply supported his expense projections.
The probative utility of an expert’s opinion depends upon the facts and reasoning presented in support of it. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981).
Accordingly, I find the expenses to be $439,124, the amount posited by plaintiff’s expert except for the 5% management fee, which was increased from $38,350 to $40,800 to reflect the economic gross income as herein found.
This leads us to the final point of controversy, namely, the capitalization rate. Both experts employed the band of investment, mortgage-equity approach. They agreed on an equity return of 10% and upon 25 years as the length of the amortization schedule of the first mortgage. They disagreed on the positions and on the mortgage rate. Plaintiff’s expert posited a 75% mortgage at 13.5%, while defendant’s expert posited a 70% mortgage at 12%, which he ignored and chose an overall rate of 15.5%.
Plaintiff’s expert concluded that mortgage lenders charge more for loans to rent-controlled apartments than they charge for loans to apartments not subject to rent control. In support of this conclusion he proffered 22 apartment loan transactions in both rent-controlled and non-rent-controlled municipalities. The mortgage interest rates on 1982 and 1983 apartment loans in non-rent-controlled communities ranged from 12.5% to 13%. Mortgage loans to apartments in rent-controlled communities, however, ranged from 12.5% to 14.25% in 1982 and 1983.
The expert’s conclusion thus rests on hard data and I find that 13.5% is a realistic mortgage rate reflective of the lender’s risk in a rent-controlled community.
By the same token, the loan value must also reflect the lender’s risk; and a 70% position is more consistent with that risk estimate than the 75% position prof erred by plaintiff’s expert. Moreover, the voluminous statistical data from the *389 American Council of Life Insurance assembled in the expert’s report supports a 70% loan position. Of the 34 apartment loans made by 20 life insurance companies in the fourth quarter of 1982 in six geographic regions of the United States, the highest loan value was 69.1%. No data was offered with respect to 1983; and the court can draw no inference that the loan value in that year exceeded 70%, irrespective of whether the apartments were located in rent-controlled or non-rent controlled communities.
I therefore conclude that the appropriate capitalization rate is 17.06%, calculated pursuant to the band of investment, mortgage-equity method, as follows:
70% mortgage @13.5%, 25 years, constant 13.99% 9.79%
30% equity @10% 3.00
Effective tax rate[2] (9.453 x .452) 4.27
17.06%
In view of the foregoing I find the true value of the subject property on October 1, 1983 to be $2,065,860, calculated under the income method as follows:
Economic rent $810,000
Less 3% vacancy & loss allowance (24,300)
Adjusted rental income $785,700
Plus laundry commissions and miscellaneous income 5,860
Effective gross income 791,560
Less expenses:
Insurance $ 14,780
Elec. & gas (incl. fuel) 182,285
Water & sewer 16,112
Wages & payroll taxes 72,017
*390 Less expenses:
Maintenance & repairs $ 80,000
Printing 17,870
Reserves for replacements 10,260
Management 40,800
Professional fees & mise. 5,000 $439,124
$352,436 Effective net income
Capitalized at 17.06%
True value $2,065,860 (rounded)
Pursuant to chapter 123, the Director, Division of Taxation, determined the average ratio for defendant taxing district to be 45.20% for the tax year 1984. The upper limit of the common level range is 51.98%, while the lower limit is 38.42%. The 1984 assessment on the subject property is 50.83% of the property’s true value as hereinabove found. As the ratio of the assessment to true value is below the upper limit of the common level range, plaintiff is not entitled to discrimination relief.
Judgment will be entered affirming the assessment.

 Includes laundry income of $5,670.

 The experts agree that the effective tax rate should be used.