DONEGAL STEEL FOUNDRY CO., a
Pennsylvania Corporation

v.

ACCURATE PRODUCTS CO., a New
Jersey Corporation, Appellant.

No. 74–1518.

United States Court of Appeals,
Third Circuit.

Argued Feb. 6, 1975.

Decided April 29, 1975.

Yale I. Lazris, Rosenstein & Lazris, Newark, N. J., for appellant.

Richard E. Prevail, Hart, Childs, Hepburn, Ross & Putnam, Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The present case involves two principal questions: first, whether the expungement by a bankruptcy court of a claim by a seller of parts against a buyer acts as an estoppel in a subsequent attempt by the seller to recover damages from a third party to whom the parts were shipped; and second, whether the delivery of parts to the third party renders that party a bailee subject to liability under the Uniform Commercial Code, 12A N.J.S.A. § 2–705, for failure to honor a stoppage-in-transit order issued by the seller.

### A.

On June 29, 1967, Guenther Systems, Inc., a New York corporation, entered into a contract with the United States Army to supply support assemblies for howitzers. On November 14, 1968, Guenther subcontracted to Accurate Products Co., a New Jersey corporation, the job of manufacturing and shipping 98 support assemblies for $95,234.44. On March 26, 1969, Guenther subcontracted an additional portion of its contract to Donegal Steel Foundry Co., a Pennsylvania corporation, which was to produce 500 steel castings for $29,280.50. In order to save labor and shipping charges, Guenther directed Donegal to ship the castings directly to Accurate. Accurate was to incorporate the castings into the

support assemblies and ship the end product to various Army depots.

The Government agreed to supply Guenther with certain government-owned tools on a "loan basis," title remaining with the Government. Donegal was not a party to the agreement regarding the tools, although it was the intended and actual user of the tools.

By November 1969 all the castings had been delivered by Donegal to Accurate, and Donegal had billed Guenther for them. No payment on the contract was made by Guenther to Donegal.

## The Bankruptcy Proceeding

On September 8, 1970, Guenther filed a petition for bankruptcy pursuant to Chapter XI of the Bankruptcy Act in the Southern District of New York. On October 13, 1970, Donegal filed a proof of claim, as an unsecured creditor, in the amount of $28,717.42,[1] the balance due on Guenther's subcontracting account with Donegal.

The referee in bankruptcy, on January 13, 1971, authorized an arrangement whereby the prime contract between Guenther and the Army would be completed by Accurate, but remain in the name of Guenther. The terms were, *inter alia*, that (1) Accurate would receive "the remaining balance ($88,713.54) of the total money allocated by the Government for this contract as parts are delivered;" (2) Guenther would "turn over clear title and physical possession of any and all tooling . . . [and] castings . . . procured or generated under subject contract and in the possession of [Guenther] to [Accurate];" and (3) Accurate would release Guenther from all secured claims.

On December 16, 1971, Guenther filed a motion to adjust claims in the bankruptcy court, objecting to Donegal's claim as "excessive." By telegram dated December 23, addressed to the bankruptcy referee, Donegal objected to any reduction of its claim and reserved its right to prove such amount due. On March 6, 1972, however, after a hearing at which Donegal did not appear, the referee reduced the claim from $28,-717.42 to $7,815.33, to be allowed as a general unsecured claim.

Meanwhile, Guenther had filed another motion in the bankruptcy court seeking an order directing Donegal to turn over to the Government all the tools Donegal had received as a result of the agreement between Guenther and the Government. Donegal filed an answer asserting a right in the tools as a set-off to its claim against Guenther and denying the bankruptcy court's jurisdiction to decide the matter. On June 29, 1972, after a hearing at which Donegal again chose not to be present, the referee ordered Donegal's claim expunged unless the tools were returned within a specified time. Donegal did not comply with the order and, accordingly, its bankruptcy claim was unconditionally expunged.

A subsequent order issued by the referee confirmed the assumption by Accurate of Guenther's contractual rights and obligations, discharged all unsecured claims against Guenther, and enjoined prosecution of such claims in any further proceedings. Neither this nor any other order of the referee was appealed by Donegal.

## Proceedings in the District Court

After Donegal became aware of Guenther's insolvency and filed a proof of claim in the Chapter XI proceeding, Donegal attempted to protect its position further by sending a letter to Accurate, dated October 22, 1970, "directing" Accurate

> not to make any further shipment of steel castings manufactured by [Donegal], which were manufactured on Guenther Systems [Purchase Order] . . . . These castings currently are in your possession and they cannot be shipped from your plant without the express prior written consent of [Donegal].

1. Of the 500 castings, 20 were sent back to Donegal for additional work; thus the amount claimed was for 480 castings.

No contractual relationship existed between Donegal and Accurate. As of October 22, 1970, approximately 100 castings had been used in completing 20 support assemblies which had already been shipped to the Army pursuant to Guenther's instructions. The remaining castings were in various stages of incorporation into the assemblies, a six to eight-month operation.

Accurate did not reply to Donegal's letter; but because of its concern regarding Guenther's financial instability, Accurate did not make any deliveries from October 22, 1970 to January 13, 1971, at which time it resumed manufacturing and delivery of the support assemblies in accordance with the order issued by the referee in bankruptcy.

On May 11, 1971, Donegal filed a complaint against Accurate in the District Court of New Jersey, for damages and injunctive relief[2] on the grounds of unjust enrichment and liability under Section 2–705 of the New Jersey Uniform Commercial Code [Seller's Stoppage of Delivery in Transit or Otherwise].[3] Donegal alleged, *inter alia,* that it had shipped to Accurate castings having a value of $28,717.42; that the castings remained its property while in Accurate's possession; that Accurate had made deliveries and would continue to do so in disregard of its October 22, 1970 letter; that Donegal had not been paid for the castings sent to Accurate; and that Accurate would be unjustly enriched when

paid by the Government for the support assemblies.

Following discovery, Accurate moved for summary judgment on the theory that the doctrines of res judicata and collateral estoppel applied so as to bar the action by Donegal. By letter opinion dated April 4, 1973, the district court granted Accurate's motion on the issue of unjust enrichment, thereby dismissing Donegal's complaint insofar as it proceeded upon that theory, but denied the motion as to Accurate's alleged liability under Section 2–705, and thus retained the claim for a trial on the merits.

In finding no bar to the litigation of the Section 2–705 issue, the district court concluded that Donegal's claim against Guenther in the Chapter XI proceedings was not identical to its claim against Accurate. The district court stated: "Donegal's claim against Guenther ultimately disallowed by the referee was for goods sold and delivered," and Accurate, as the lawful successor to Guenther under the prime contract, was "immune to another prosecution of Donegal's claim for the contract price." By contrast, however, the district court held that Donegal's present claim against Accurate "is based upon Accurate's allegedly willful disregard of Donegal's instructions not to ship the castings Donegal had delivered."

After trial the jury returned a verdict in favor of Donegal and against Accurate for $20,900.00, and judgment was entered by the district court.

---

**2.** Donegal sought an order enjoining Accurate from making further deliveries and directing Accurate to return all the castings to Donegal. A preliminary injunction was issued May 24, 1971, enjoining Accurate from machining or shipping any castings received from Donegal; however, a Consent Order was later entered removing the injunction.

**3.** In relevant part, 12A N.J.S.A. § 2–705 provides:

(1) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent.

. . .

(2) As against such buyer the seller may stop delivery until

(a) receipt of the goods by the buyer; or

(b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or

(c) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman

. . . .

(3)(a) To stop delivery the seller must so notify as to enable the bailee by reasonable diligence to prevent delivery of the goods.

(b) After such notification the bailee must hold and deliver the goods according to the directions of the seller but the seller is liable to the bailee for any ensuing charges or damages.

(c) If a negotiable document of title has been issued for goods the bailee is not obliged to obey a notification to stop until surrender of the document. . . . .

### B.

In its appeal, Accurate advances two grounds for reversal: First, that Donegal's claim against Accurate is barred by the doctrines of res judicata and collateral estoppel,[4] and alternatively, that since Accurate was not a bailee, the district court erred in finding Accurate liable for failure to honor Donegal's demand to stop delivery of the castings. Donegal counters Accurate's contentions by insisting that the bankruptcy proceedings are irrelevant, and that the sole issue is Accurate's liability for damages under Section 2–705.

### Res Judicata and Collateral Estoppel

Since federal jurisdiction is based upon diversity of citizenship, the law of the forum state, New Jersey, would ordinarily control the substantive rights of the parties. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the past we have applied this fundamental rule to pleas of res judicata and collateral estoppel.[5] But in some diversity cases there may be a federal matter presented, in which event federal law controls.[6] We need not now determine whether federal or state law applies when the judgment of a federal bankruptcy court is put in issue in a federal court in a diversity action[7] since, in the factual situation here, the result under either would be the same.

The doctrine of res judicata serves the purpose of judicial finality. If there is a final, valid judgment rendered on the merits, the doctrine precludes relitigation of the same cause of action between the same parties or their privies.[8] The judgment is a conclusive determination "as to the claim or demand in controversy . . . not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[9]

In light of the above, we have concluded that the orders of the bank-

---

**4.** Accurate's brief is not entirely clear as to how we should apply the doctrines of res judicata and collateral estoppel in order for it to prevail on this theory. However, Accurate apparently contends that Donegal's claim against Guenther is now res judicata as to Accurate, Guenther's successor in interest, and that Donegal should be estopped from denying the conclusive effect of the referee's orders expunging the claim and authorizing the arrangement in bankruptcy.

**5.** Murphy v. Landsburg, 490 F.2d 319 (3d Cir. 1973). See also Gambocz v. Yelencsics, 468 F.2d 837, 841 n. 4 (3d Cir. 1972); Lynne Carol Fashions, Inc. v. Cranston Print Works Co., 453 F.2d 1177 (3d Cir. 1972).

**6.** "[I]t is the source of the right" claimed "and not the ground on which federal jurisdiction over the case is founded, which determines the governing law. . . ." Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 540 n. 1 (2d Cir. 1956). Supportive of this statement is Judge Friendly's article, In Praise of Erie—and of the New Federal Common Law, 19 Record of N.Y.C.B.A. 64, 82 (1964): "Just as federal courts now conform to state decisions on issues properly for the states, state courts must conform to federal decisions in areas where Congress, acting within powers granted to it, has manifested, be it ever so lightly, an inten-tion to that end." See 1A Moore's Federal Practice ¶ 0.305[3].

**7.** In Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938), the Supreme Court held it had jurisdiction to review a particular decision of the Illinois Supreme Court since the effect the Illinois court gave to a res judicata plea based upon orders of a district court (N.D.Ill.) in bankruptcy raised a federal question, which was "the power of the federal courts to protect those who come before them relying upon constitutional * * * grants of power." (305 U.S. at 171, 59 S.Ct. at 137). See generally 1A Moore's Federal Practice ¶ 0.305[3]; 1B Moore's Federal Practice ¶ 0.401.

**8.** Middlesex Con. P. & E. Corp. v. Borough of Carteret, 35 N.J.Super. 226, 113 A.2d 821, 827 (App.Div.1955); Ray v. Beneficial Fin. Co., 92 N.J.Super. 519, 224 A.2d 143, 154 (1966).

To the same effect, see e. g., Lawlor v. National Screen Service, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Murphy v. Landsburg, 490 F.2d 319 (3d Cir. 1973), cert. denied, 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 289 (1974).

**9.** Mazzilli v. Accident & Casualty Ins. Co., 26 N.J. 307, 139 A.2d 741, 745 (1958), quoting from Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1877).

ruptcy referee do not constitute res judicata so as to bar the present action, since the Chapter XI proceeding involved a different cause of action than that prosecuted herein.[10] In the former, the cause of action was based upon Donegal's proof of claim against Guenther for the contract price of the castings; whereas in the present case, Donegal advances a cause of action premised upon Accurate's alleged liability under the Uniform Commercial Code § 2–705.[11]

To the extent the prior judgment has any effect upon the present action,[12] it is more appropriate to characterize that effect as one based upon the doctrine of collateral estoppel rather than res judicata. If a court of competent jurisdiction decides a matter distinctly put in issue, relitigation of the same question in a subsequent proceeding may be barred by the rule of collateral estoppel.[13] The conclusive effect of a prior adjudication constitutes an estoppel only with respect to issues actually litigated and necessary to support the initial judgment. Litigation of any matter that was "collaterally in question," "incidentally cognizable," or "to be inferred by argument from the judgment" is not restricted in a subsequent suit.[14]

Without identity of issues, the party asserting the collateral estoppel may not prevail.[15] For an issue to have been conclusively determined, it must have been raised in the prior action.[16] In the case at hand the requisite identity of the issue is missing. The questions of fact and law disposed of by the referee are not the same as those adjudicated in the district court. We are here presented with the issue whether Accurate, as an alleged bailee of Donegal, is liable to the latter for failure to honor the stoppage-in-transit order. This issue was neither raised nor determined in the bankruptcy proceeding.

Since Accurate's pleas of res judicata and collateral estoppel are of doubtful merit under either federal or New Jersey law we find no bar to the adjudication of the issue in the district court.

10. "Cause of action" cannot be precisely defined, nor can a simple test be cited for use in determining what constitutes a cause of action for res judicata purposes. In Williamson v. Columbia Gas & Electric Corp., 186 F.2d 464 (3d Cir. 1950), Judge Goodrich examined the definitional problem, and in 1B Moore's Federal Practice ¶ 0.410[1], the author notes some of the tests that have been suggested, for example, "whether the same right is infringed by the same wrong," citing Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927). See also O'Shea v. Chrysler Corporation, 206 F.Supp. 601, 605 (D.N.J.1962) (diversity action in which the court declared that "the proper test . . . is to inquire whether the same evidence that is necessary to maintain the second action would have been sufficient to support the first action."). An interesting analysis of the cause of action concept, in the context of 28 U.S.C. § 1441(c), is set forth in American Fire & Casualty Co. v. Finn, 341 U.S. 6, 12–14, 71 S.Ct. 534, 95 L.Ed. 702 (1951). The causes of action here are not similar under any test propounded.

11. Cf. Lynne Carol Fashions, Inc. v. Cranston Print Works Co., supra at 1183; Mazzilli v. Accident & Casualty Inc. Co., supra note 9 at 139 A.2d 745–46; Brick Tp. Ocean County v. Vannell, 55 N.J.Super. 583, 151 A.2d 404, 408 (App.Div.1959).

12. There can be no question that bankruptcy judgments may have a res judicata or collateral estoppel effect. See, e. g., Stoll v. Gottlieb, supra; Rappaport v. Nichols, 103 N.J.Super. 445, 247 A.2d 495 (App.Div.1968).

13. See United States v. Silliman, 167 F.2d 607, 613–14 (3d Cir.), cert. denied, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948); Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 251 A.2d 278 (1969); Washington Tp. v. Gould, 39 N.J. 527, 189 A.2d 697, 700 (1963).

14. Robinson-Shore Development Co. v. Gallagher, 26 N.J. 59, 138 A.2d 726, 731 (1958); Mazzilli v. Accident & Casualty Ins. Co., supra note 9 at 139 A.2d 746. See also Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1877).

15. Robinson-Shore Development Co. v. Gallagher, supra note 14 at 138 A.2d 731; Abel v. Bd. of Works of City of Elizabeth, 63 N.J.Super. 500, 164 A.2d 764, 771–72 (App.Div.1960). See also Lynne Carol Fashions, Inc. v. Cranston Print Works Co., supra, note 5, a diversity case wherein we applied under both federal and New York law, the same standard with regard to identity of issues as applied by New Jersey courts.

16. Janvari v. Peter Schweitzer Co., 21 N.J.Super. 248, 91 A.2d 113, 115 (App.Div.1952); 1B Moore's Federal Practice ¶ 0.443[3].

*Bailment*

█ Because Donegal's complaint is premised on Section 2–705, dealing with the duty of a bailee to comply with the delivery instructions of a bailor, the existence of a bailment relationship is a precondition to finding Accurate liable under this section. Donegal avers that a "bailment for mutual benefit" existed between it and Accurate.[17] In contrast, Accurate argues that the delivery of the steel castings was made pursuant to a sale rather than a bailment, and that in any event, it disposed of the castings pursuant to the direction of the bankruptcy referee.

It is generally accepted that there are three kinds of bailment: for the sole benefit of the bailo·; for the sole benefit of the bailee; and for their mutual benefit. The last has been defined as the "letting out of work and labor to be done, or care and attention to be bestowed by the bailee on goods bailed for a recompense."[18] Donegal asserts that it "bailed" the castings to Accurate for further processing and delivery to Guenther's customer. "Both bailor and bailee expected financial recompense—hence the clear existence of a mutual benefit bailment."

Donegal cites only Tomko v. Sharp, *supra* note 17, as general support for its proposition that a mutual benefit bailment existed; but *Tomko* is clearly distinguishable on its facts since it involved a "gratuitous bailment for the bailor's sole benefit."[19] In addition, a review of the New Jersey cases actually involving mutual benefit bailments lends no support to Donegal's theory since these cases are likewise distinguishable.[20]

█ Acceptance of the position urged by Donegal would distort the concept of a mutual benefit bailment as developed in New Jersey. The common theme underlying the definitions of a bailment is that the article bailed will ultimately be returned to the original owner or delivered according to his instructions to another party—thus, control over the final disposition of the article is held by the original owner. This essential factor is absent from the case before us. Neither the contract between Donegal and Guenther nor any alleged

17. In determining the existence of a bailment relationship we apply the law of New Jersey since the alleged contract of bailment was entered into when Donegal delivered, and Accurate received, the castings in New Jersey. The parties' briefs assumed that the law of New Jersey was applicable to the bailment issue.

Bailment has not been defined with precision nor has it been the subject of any extended discussion by the New Jersey courts. However, it has variously been defined as: "the rightful possession of goods by one who is not the owner," Zuppa v. Hertz Corp., 111 N.J.Super. 419, 268 A.2d 364, 366 (Dist.Ct.1970); and an event wherein "an article of personal property is put into the hands of one for a special purpose, and is to be returned by the bailee to the bailor or delivered to some third person when the object of the trust is accomplished," Tomko v. Sharp, 87 N.J.L. 385, 94 A. 793, 794 (Sup.Ct.1915); and as the "holding of a chattel by one person under an obligation to return or deliver it to another after some special purpose is accomplished," Gilson v. Pennsylvania R. Co., 86 N.J.L. 446, 92 A. 59, 60 (Sup.Ct. 1914). *See generally* 3 Seltzer N.J.Law 12–156 (1971). In his charge to the jury, the trial judge below adopted this last definition in addition to defining bailment "as the delivery of goods for some particular purpose or on deposit under a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be." (Transcript of Proceedings, 3/14/74, at 35—Doc. 34 of Civil No. 676–71, D.N.J.).

18. 3 Seltzer N.J. Law 12–160. *See also* 9 Williston on Contracts § 1040 (3d ed. 1967).

19. 94 A. 793, 794 (N.J.Super.Ct. 1915).

20. *See, e.g.,* Parnell v. Rohrer Chevrolet, 95 N.J.Super. 471, 231 A.2d 824 (App.Div., 1967) (action by automobile owner to recover damages for car having been "stripped" while in the custody of defendant service garage); Rodgers v. Reid Oldsmobile, Inc., 58 N.J.Super. 375, 156 A.2d 267 (App.Div., 1959) (substantially similar facts); Nelson v. Fruehauf Trailer Co., 20 N.J.Super. 198, 89 A.2d 445 (App.Div., 1952) (if custody or use of bailed article is incidental to a separate business transaction between the parties, there may be a bailment for mutual benefit).

understanding between Donegal and Accurate contemplated the return of the castings or the finished product to Donegal[21] whether for Donegal's use or for delivery to any party specified by Donegal. There was no "consensual undertaking" by Accurate "to accept an entrustment to it by" Donegal of the castings.[22]

Delivery to Accurate, rather than to Guenther directly, was only an incident of accommodation resulting from Guenther's contract with Donegal, and not a contract of bailment "voluntarily entered into" by Accurate with Donegal.[23] Surely Donegal could not have claimed Accurate to be its bailee if it had first shipped the castings to Guenther, the immediate purchaser, and Guenther then shipped them to Accurate for further processing and ultimate delivery to Guenther's customer.

The transaction here resembles a sale more than a bailment: "A sale transfers ownership and possession of the article in exchange for the price; a bailment for hire [mutual benefit bailment] transfers possession in exchange for the rental and contemplates eventual return of the article to the owner." Cintrone v. Hertz Truck Leasing & Rental Serv., 45 N.J. 434, 212 A.2d 769, 776 (1965).

■ Even if Accurate could be deemed a bailee under New Jersey law, it is doubtful whether Donegal could recover under Section 2–705. First, there is serious question whether the right granted a seller under this section, namely, to "stop delivery of goods in the possession of a carrier or other bailee," exists when the goods are in the possession of a bailee who has undertaken to do more than "merely" hold or forward them.[24]

■ Second, the right to stop delivery lasts only while the goods are "in transit," and that status ends "when the goods arrive at their destination and are delivered to the buyer or to his representative who is not a mere intermediary or link in the transit." 3 Williston on Sales § 24–6, at 411 (4th ed. 1974). The destination contemplated by Donegal and Guenther, as evidenced by their contract, was Accurate's place of business. This was reached. Thus, Accurate's receipt of the castings for the purpose of further processing and final delivery of the support assemblies under a new and distinct contract would usually be considered in termination of the original transit. Cf. In re Stork & Co., 271 F. 279 (2d Cir. 1921).

■ Finally, Accurate's liability under Section 2–705 is uncertain since the castings, as a part of the support assemblies, were shipped to the Army depots pursuant to the referee's order. It would seem somewhat incongruous to hold Accurate responsible for goods disposed of through a valid legal process in view of the fact that Donegal had had notice of the proceeding and an opportunity to protect its interest.[25]

### C.

Inasmuch as the relationship between Accurate and Donegal does not fit within the concept of a bailment as defined

---

21. Under a bailment contract a bailee may be directed to return the identical thing bailed or its product to the bailor. 9 Williston on Contracts § 1035 (3d ed. 1967).

22. Cerreta v. Kinney Corp., 50 N.J.Super. 514, 142 A.2d 917, 919 (App.Div., 1958).

23. "The bailment relation, although it may in some circumstances originate by operation of law such as the finding of lost goods or the seizure of goods under legal process, is essentially and commonly one of contract." Silvestri v. South Orange Storage Corp., 14 N.J.Super. 205, 81 A.2d 502, 504 (App.Div., 1951).

See Zuppa v. Hertz Corp., supra note 16, 268 A.2d at 366.

24. See 2 Anderson UCC § 2–705:4 (2d ed. 1971); 3 Williston on Sales § 24–6, at 409–10 (4th ed. 1974). Cf. 4A Collier on Bankruptcy ¶ 70.40. But see Official Code Comment, UCC § 2–705.

25. Cf. Morgan v. Chicago & N. W. Ry. Co., 167 Wis. 48, 166 N.W. 777, 779 (1918). Stoppage-in-transit orders are recognized and given effect by bankruptcy courts. 4A Collier on Bankruptcy ¶ 70.40.

by the New Jersey courts, we would have to extend the bounds of state law in order for Donegal to prevail on its theory of liability under Section 2–705. Such a step federal courts in a diversity action are reluctant to take.

The evidence here could not support a finding of a bailment relationship, and absent such a relationship, Accurate may not be held liable for disregarding Donegal's demand.

Accordingly, an order will be entered reversing the judgment of the district court.