Bonnie Jayne SWOROB, Dorothy Hall, Fred Druding, Connie McHugh, and the Whitman Council, Inc., Plaintiffs,

v.

Patricia HARRIS, Individually and as Secretary of the Department of Housing and Urban Development, Thomas Maloney, Individually and as the Regional Director of the Department of Housing and Urban Development and Don Morrow, Individually and as Area Director of the Department of Housing and Urban Development, Defendants,

Resident Advisory Board,
Defendant-Intervenor.

Civ. A. No. 78–752.

United States District Court,
E. D. Pennsylvania.

April 6, 1978.

---

Joseph M. Gindhart, Philadelphia, Pa., for plaintiffs.

Robert N. DeLuca, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Wm. F. Hall, Jr., Dept. of HUD, Philadelphia, Pa., for defendants.

Jonathan M. Stein, Harold R. Berk Community Legal Service, Philadelphia, Pa., for defendant-intervenor.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This action was filed on March 7, 1978 seeking to enjoin any further action in connection with the construction of 120 townhouses at Whitman Park in Philadelphia, Pennsylvania until the Department of Housing and Urban Development ("HUD") performs an assessment of the environmental impact these townhouses will have on the area. This Court previously ordered that HUD, the Redevelopment Authority of the City of Philadelphia ("RDA"), Philadelphia Housing Authority ("PHA") and the City of Philadelphia ("City") "shall immediately take all necessary steps for the construction of the Whitman Park Townhouse Project as planned." *Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1029 (E.D. Pa.1976), *aff'd in part, rev'd in part on other grounds*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499 (1978) [hereinafter cited as *RAB v. Rizzo*].

At a conference held in chambers on March 7, 1978, the parties agreed that the

trial of the action on the merits would be advanced and consolidated with the hearing on plaintiffs' motion for a preliminary injunction. The consolidated trial, before the Court without a jury, commenced on March 13, 1978. The Court was immediately presented with two motions: (1) defendants' motion to dismiss, and (2) the Resident Advisory Board's motion to intervene as a party-defendant. The Court granted the Resident Advisory Board ("RAB") leave to intervene and took the other motion, which had been joined in by RAB, under advisement and proceeded to receive testimony in connection with the merits of plaintiffs' case. At the conclusion of plaintiffs' evidence, the defendants moved, pursuant to Fed.R.Civ.P. 41(b), for an involuntary dismissal. For the reasons hereinafter set forth, the Court has decided to grant defendants' motion, and render judgment against the plaintiffs.

Fed.R.Civ.P. 41(b) provides in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

The granting of the defendants' motion at this stage is a decision on the merits in favor of the defendants; in rendering the judgment, the Court is not as limited in its evaluation of the plaintiffs' case as it would be on a motion for directed verdict. In ruling on a Rule 41(b) motion

> [t]he court is not to make any special inferences in the plaintiff's favor nor concern itself with whether plaintiff has made out a prima facie case. Instead it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.

9 Wright & Miller, *Federal Practice and Procedure* : Civil § 2371 at 224–25 (1971) (footnotes omitted); 5 *Moore's Federal Practice* ¶ 41.13[4] at 41–193 to 194.

The presentation of plaintiffs' evidence having been concluded, it became apparent to the Court that judgment should be entered in defendants' favor. The legal grounds upon which the Court relies in making its determination to render judgment against the plaintiffs are: (1) res judicata; (2) laches; and (3) failure to state a claim on the merits, pursuant to a Fed.R. Civ.P. 41(b) motion.

### I. *Res Judicata*

The doctrine of res judicata is intended as a bar to repetitious litigation. *Cramer v. General Telephone & Electronics,* 443 F.Supp. 516, 520 (E.D.Pa.1977). Res judicata is based on the proposition that a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. *Bruszewski v. United States,* 181 F.2d 419, 421 (3d Cir. 1950). As the Third Circuit stated in *Hubicki v. ACF Industries, Inc.,* 484 F.2d 519, 524 (3d Cir. 1973):

> The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim on demand, but as to any other admissible matter which might have been offered for that purpose." [1]

*See also, Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588, 602 (3d Cir. 1977); *Donegal Steel Foundry Co. v. Accurate Products Co.,* 516 F.2d 583, 587 (3d Cir. 1977).

The first requirement for res judicata is that the same parties or parties in privity with them were present in the prior litigation. The plaintiffs in this case were

---

1. *Quoting Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

parties in *RAB v. Rizzo.* In *RAB v. Rizzo,* the Whitman Area Improvement Council ("WAIC") intervened as a defendant on behalf of all residents of the Whitman Urban Renewal Area and "All Other Persons Acting in concert with them or otherwise participating in their aid". *See* WAIC's motion to intervene, filed June 30, 1971; *RAB v. Rizzo,* 425 F.Supp. at 1024, n. 61. It was testified at this trial that the Whitman Council, Inc. was WAIC, having been incorporated in 1977 (Druding, N.T. 2–165). Although Connie McHugh is not a resident of the Whitman Urban Renewal Area, she testified that she lives in the adjoining community and that she has participated as an active supporter of WAIC in their efforts to stop the construction of these townhouses (McHugh, N.T. 2–128, 2–129, 2–136). Therefore the first requirement as to res judicata has been satisfied.

■ The second requirement for res judicata is that a court of competent jurisdiction entered a final judgment on the merits. There can be no doubt that this requirement has been satisfied. *RAB v. Rizzo.*

■ The final requirement is that this action concerns the same subject matter as the prior suit. In *RAB v. Rizzo,* the defendants came forward with a variety of reasons in their attempt to justify their termination of construction of the Whitman townhouses. One issue which WAIC raised was the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* which is the sole ground upon which they now seek to enjoin construction. One need only look at WAIC's answer to plaintiffs' corrected second amended supplemental complaint, which was filed on March 20, 1974, to discover that WAIC asserted as a defense that "[n]o environmental impact statement has been filed with regard to the project herein involved by RDA, PHA and/or HUD in violation of applicable HUD regulations hereto." (Paragraph 68). In addition, a cursory review of the notes of testimony in *RAB v. Rizzo* reveals many instances of testimony concerning NEPA, for instance:

1. Testimony of the former Whitman Urban Renewal Area project administrator concerning the filing of an environmental impact assessment or statement. (N.T. 57–111, 57–112);

2. Testimony of former WAIC president Morris Jacobs as to environmental reasons given by a former WAIC president in 1965 objecting to public housing on the site including overcrowding, lack of recreational facilities, lack of police protection to deter crime, impact on schools, increase of social problems, increased demand for parking facilities, increase in vehicle traffic, close proximity to "potentially dangerous Liquid Carbonics plant", and destruction of concept of private homes and private home-ownership in the area. (N.T. 55–101, 55–102).[2]

3. Morris Jacobs' testimony that there was no longer a problem from the Liquid Carbonics plant since the concern ceased its manufacturing operation for a plumbing supplies warehouse. (N.T. 55–105).

4. The following environmental concerns in connection with public housing:

 (a) Filth and dirt in and around public housing (N.T. 54–21, 54–91, 54–103, 55–69);

 (b) Violence and crime associated with public housing (N.T. 54–21, 54–91);

 (c) Deterioration of the environment and the way of life in the Whitman Area if public housing is constructed (N.T. 54–109); and

 (d) Deplorable conditions generally associated with public housing (N.T. 55–188).

5. Statement made in 1970 by Alice Moore, a former WAIC president, that, in effect, there were no environmental problems with the construction of the townhouses. She stated that the plans for the townhouses "look excellent", and that WAIC was "very impressed with the plans" which WAIC believed would make the houses "an

---

2. These were reasons given to change this housing from high rise, high density to low rise, single family units. (N.T. 55–102).

asset to our community". *RAB v. Rizzo,* 425 F.Supp. at 997–98.

6. Multicon's plans for construction were chosen, in part, because they would not disrupt the traffic flow in the area. (N.T. 5–27).

7. The Court in making its findings in *RAB v. Rizzo,* found that WAIC had not proved its allegations concerning the unsafe and unsanitary conditions which would be occasioned by the townhouse project. *Id.* at 1025.

WAIC did not mention its NEPA claims in its proposed findings of fact and conclusions of law submitted to this Court in *RAB v. Rizzo,* nor did it raise these issues in its motion to amend this Court's findings of fact, conclusions of law and judgment filed November 15, 1976. However, before the Court of Appeals for the Third Circuit, WAIC renewed its NEPA claims as a ground for reversing this court's findings of fact and conclusions of law. WAIC argued "that no Environmental Impact Statement had been filed respecting the project." *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 150 (3d Cir. 1977).

Finally, in their petition for *certiorari* to the Supreme Court, WAIC presented the NEPA issue as the sole question for review by the Court:

"Question Presented

"Where the United States Department of Housing and Urban Development did not even consider environmental issues under The National Environmental Policy Act and its own regulations, yet alone file a required statement prior to approving and funding a 120 unit public housing project did the Courts below err in authorizing its construction."

Petition for Writ of Certiorari of Whitman Area Improvement Council et al., at 2–3 (No. 77–759, October Term, 1977). WAIC's *certiorari* petition stated that not only had WAIC asserted a NEPA claim below, but also that they had "proved" that no environmental statement was ever prepared by HUD. *Id.* at 12.

We find, therefore, that WAIC raised this same NEPA issue in *RAB v. Rizzo,* and the fact that in the present litigation the plaintiffs may have presented more evidence on the NEPA issue does not preclude the application of res judicata. As pointed out in *Hubicki v. ACF Industries,* 484 F.2d at 524, the parties are bound as to "any other admissible matter which might have been offered . . . ." In *RAB v. Rizzo,* WAIC was given a full and fair opportunity during the 57 days of litigation before this Court to present all admissible evidence concerning their NEPA claim. Accordingly, since all three requirements for the application of res judicata have been satisfied, we hold that plaintiffs are barred from relitigating their NEPA claims.

## II. *Laches*

In addition to res judicata, the doctrine or laches precludes this litigation Laches conceptualizes the inequity which would result if a stale claim were permitted to be enforced; its application is left to the sound discretion of the trial judge. *Gruca v. United States Steel Corporation,* 495 F.2d 1252, 1258 (3d Cir. 1974). Laches requires two elements, inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. *Gardner v. Panama Railroad Co.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 96 L.Ed. 31 (1951); *National Ass'n of Government Employees v. Rumsfeld,* 418 F.Supp. 1302, 1304 (E.D.Pa.1976).

We find present in this litigation the elements necessary for the application of the doctrine of laches. Townhouses were approved for the Whitman site in 1967, three years after they were authorized by the Barrett Amendment. *RAB v. Rizzo,* 425 F.Supp. at 996. WAIC actively participated in all phases of the proposed construction of the townhouses. *Id.* at 1025. In fact, WAIC was formed in the mid-1960's for the very purpose of opposing high-rise public housing at the site. *Id.* at 995.

The National Environmental Policy Act ("NEPA") was enacted in 1969 to become effective on January 1, 1970. If we were to

overlook the fact that these same parties litigated the NEPA issue in *RAB v. Rizzo,* we must then conclude that they have waited more than eight years to litigate the NEPA issue. No one has offered any justification or excuse for this delay. Moreover, this is not the situation in which the public interest in the preparation of an environmental assessment outweighs the plaintiffs' inexcusable delay and precludes application of the doctrine of laches. As hereinafter pointed out, most of the environmental problems cited by the plaintiffs in this litigation are presently existing environmental problems of the area and are not problems which will be created by or aggravated by the construction of the townhouses. Furthermore, plaintiffs have brought to this Court's attention few, if any, environmental problems which they will suffer as a result of the construction of the townhouses.[3] We hold that plaintiffs have not sustained their burden in excusing their delay in initiating this action. *See Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1259 (3d Cir. 1974).

 The second element necessary for the application of the doctrine of laches is that the defendant has been injured by the delay. The Government of the United States, acting through HUD, has already suffered excessive monetary losses occasioned by the previous litigation. *See RAB v. Rizzo,* 425 F.Supp. at 1028. Further delays will undoubtedly mean additional monetary loss to the taxpayers.[4] As stated by the Court in *Gruca v. United States Steel Corp.,* 495 F.2d at 1260, "[p]ecuniary loss is a very real factor to be considered in determining whether prejudice to the defendant exists." More important than the loss of dollars and cents is the irreparable injury which will be suffered by the residents of

the City (defendant-intervenor) who are in desperate need of decent housing. As this Court pointed out in its memorandum of March 4, 1977:

> there is an urgent need for additional decent housing for low-income families in the City of Philadelphia. Further delay in the construction of these 120 townhouses will undoubtedly injure the plaintiffs . . . .

*Resident Advisory Board v. Rizzo,* 429 F.Supp. 222, 226 (E.D.Pa.1977). The Court finds that the plaintiffs have been guilty of laches, and are not entitled to the equitable relief which they seek in this action.

### III. The Merits of Plaintiffs' NEPA Claims

 Plaintiffs contend that HUD is required, pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* to perform an environmental impact study prior to the construction of the 120 townhouses at Whitman Park. NEPA has been the subject of extensive litigation since its enactment in 1969. It is well settled that it imposes on governmental agencies both procedural and substantive requirements which must be carried out prior to the commitment of Federal funds for the project. *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341, 1362 (E.D.Pa.1977). To accomplish the environmental goals set by Congress, the Act establishes certain procedural requirements with which Federal agencies must comply. They must:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
> (i) the environmental impact of the proposed action,

---

**3.** This raises a serious question as to whether plaintiffs have standing to prosecute this action. *See Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 510 F.2d 1037, 1038 (4th Cir. 1975), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975) (plaintiffs who complained that they would suffer financial injury if a hospital were built did not have standing to bring a NEPA action

based on their allegation that a hospital should not be constructed near a noisy airport, because the plaintiffs would not suffer from such noise.)

**4.** Advertisements for bids to construct these townhouses have been prepared and will soon appear in a number of publications in order to attract bidders.

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). NEPA has no application, however, to any project where all major federal action was taken prior to the effective date of the Act, January 1, 1970. The issue for the Court to decide is when the last major Federal action transpired. Plaintiffs contend that substantial major Federal action in connection with the building of the townhouses has and will occur subsequent to the effective date of NEPA. We disagree.

As this Court found in *RAB v. Rizzo,* 425 F.Supp. at 995–998:

On June 4, 1956, PHA conducted a public hearing at which various sites were considered for the development of low income housing projects. Citizens and groups from the Whitman area were in attendance at this PHA hearing, some nineteen of which testified and expressed their views on public housing. After the hearing, PHA passed a resolution selecting a site at Front and Oregon in Philadelphia for the Whitman project. Also in 1956, the Whitman site was approved as a public housing site by the Philadelphia City Planning Commission. On February 18, 1957, HUD gave tentative approval to the Whitman site for the development of a conventional public housing project. An annual contributions contract was executed by HUD on December 6, 1957, in the amount of $8,607,793, approving a development program for Whitman of 476 units and authorizing PHA to begin planning the Whitman project. Drawings for a high rise public housing project at the Whitman site were submitted to HUD by PHA and were approved by HUD on August 28, 1959. Condemnation and acquisition of the site by PHA took place during 1959 and 1960, culminating with the award of demolition contracts on June 26, 1960. This action had the effect of removing some of the Black families who lived on the Whitman site.

On January 12, 1961, a second public hearing was conducted by PHA for the purpose of adding two small parcels of land to the Whitman site, which addition was approved by PHA. Local opposition developed in reaction to the placing of high rise public housing in Whitman and WAIC was formed to oppose the Whitman project as planned.

On October 27, 1963, RDA executed an application to establish the Whitman Urban Renewal Area. The application sought a federal grant of $3,311,024 and a temporary loan of $5,545,524 (totaling $8,856,548) to carry on the land acquisition, relocation of site residents, demolition and site clearance, site preparation, and rehabilitation or conservation required for the proposed Whitman Urban Renewal Area. The plan included clearing 130 homes, none of which were at the Whitman public housing site, and rehabilitating 2,500 structures. The Whitman Urban Renewal Plan, dated October 23, 1963, which included the previously established Whitman public housing site, contained no height limitation for public housing within the area. The land use map for the Whitman Urban Renewal Area provides for public housing as the land use for the Whitman site and is the only site in the Whitman Urban Renewal Area designated for public housing. In 1963, the estimated racial composition of the Whitman Urban Renewal Area was 3,373 White families and 94 non-White families, 21 of which were to be displaced by the urban renewal. The total amount of all governmental funds expended through RDA in the Whitman Urban Renewal Area from 1963 through April 30, 1975 has been $11,178,210.43; of this amount $6,682,686.92 has constituted federal funds from HUD. RDA, with federal funds from HUD and from other sources, condemned and acquired a total of 101 properties and parcels of land in the Whit-

man Urban Renewal Area at a total estimated cost of $1,550,075. Between 1969 and 1973, 109 new homes were privately developed and sold for between $25,000 and $30,000, all of which were eligible for FHA-insured mortgages. There was no opposition by WAIC to these privately developed homes. From January 1, 1966 until May 1, 1975, Whitman residents, through RDA and with the aid of federal funds, have obtained $2,718,278 in loans and grants to rehabilitate their homes. A total of 1,123 households have received funds from this program. Over one-fourth of all the households in the Whitman area have benefited from the grant and loan program initiated by RDA. Further, urban renewal activities in the area have included a wide range of activities benefiting the Whitman area.

In 1964, after opposition by WAIC had developed to the high-rise design of the proposed Whitman project, a special Act of Congress was passed, known as the Barrett Amendment. Pursuant to the Barrett Amendment, the design of the proposed Whitman project was changed from high-rise to low-rise construction and RDA purchased the Whitman site from PHA for $1,217,679.59 with the understanding that the land would be conveyed by RDA to a developer for construction, and finally deeded back to PHA for management by it as a low-rise public housing project. The sale of the land to RDA resulted in a writedown of the cost of the land and a change in the zoning of the Whitman site within the Urban Renewal Area to permit low-rise public housing. Such a change in the urban renewal plan was approved by City Council on September 2, 1964. In May of 1967, City Council passed an ordinance approving the purchase of the land from PHA. In late 1967, Hartsville Construction Company was chosen as a developer to build 114 units on the Whitman site. WAIC opposed certain aspects of the Hartsville plan and Hartsville refused to execute the contract of sale tendered to it on May 2, 1969. Because of the opposition by WAIC to the Hartsville plan a decision was made to look for a new developer which would develop its own plan and not use the old Hartsville plans. Also, because the Hartsville plans were not to be used, a "turnkey" developer was obtained. A turnkey developer differed from a conventional housing developer in that the turnkey developer would purchase the land, hire the architect to design the project, produce the drawing, set a cost for his project and then submit his proposal to the Housing Authority. The Housing Authority, if it decided to accept a turnkey developer's proposal, would, after appropriate public hearings and approvals, sign a contract with the turnkey developer and HUD, which specified that the turnkey developer would build the project and upon completion turn it over to the Housing Authority for the agreed upon purchase price. The Housing Authority would manage the project and HUD would provide the necessary subsidies.

A HUD Equal Opportunity staff review of the Whitman site was conducted and approval of the site for low income public housing was recommended on June 4, 1968. The Whitman site was described as being located in a predominantly all-White area, conducive in all respects to Equal Opportunity Housing. Thereafter, HUD approved the Whitman site. The next year HUD established the Whitman project as a "balance" for the Morton Addition, a project located in a Black area of Philadelphia. The Morton Addition has been completed and is now occupied.

During the latter part of 1969, PHA and RDA advertised for turnkey developers for the Whitman site pursuant to all applicable regulations. Twelve developers responded, and on April 28, 1970, PHA chose Multicon as the developer, which choice was approved by HUD on May 20, 1970. The Multicon proposal was considered superior to all other proposals because it maintained existing street patterns and the housing was of the same design as the other houses in the Whitman area. The Whitman Park Townhouse Project was unique in design for public housing because each house was designed with street frontage and a separate entrance and could be individually plotted on a separate building lot. This

design was in anticipation of a federal program called Turnkey III, which called for a lease-purchase agreement pursuant to which the public housing tenant could eventually become the owner of his own home.

On July 14, 1970, RDA and Multicon entered into an agreement of sale to enable Multicon to obtain the land at Front and Oregon and build the Whitman Park Townhouse Project. On October 27, 1970, Mayor Tate signed an ordinance which had been passed by City Council approving Multicon as the developer of the project. On October 29, 1970, based upon appropriate HUD approval of the project, PHA and Multicon entered into an agreement of sale whereby Multicon was to construct 120 townhouses on the Whitman site. On October 30, 1970, RDA conveyed title to the Whitman Park Townhouse Project site to Multicon.

Prior to the signing of the contracts of Multicon, WAIC, which was designated as the local citizen participation unit, for the Whitman Urban Renewal Area, was involved in numerous meetings and correspondence with RDA, PHA and Multicon officials. On June 2, 1970, a meeting was held in the Whitman community and was attended by officials from RDA, PHA, Multicon and the Mayor's office. The meeting was held to give WAIC an opportunity to closely review the Multicon plans for the Whitman Park Townhouse Project. WAIC made several suggestions in connection with the building materials to be used in the project and fire safety for the completed townhouses. The suggestions were accepted by those officials in attendance at the meeting and, after investigation, appropriate changes were made in the Whitman Park Townhouse Project plans. Also, the home ownership potential and the advantages thereof of a public housing development under Turnkey III were explained to WAIC. WAIC officials stated after the June 2, 1970 meeting that the Whitman Park Townhouse Project plans "look excellent", that WAIC was "very impressed with the plans" and that WAIC felt that the houses would be "an asset to our community."

On January 28, 1971, the president of WAIC, Alice Moore, wrote to RDA in connection with the Whitman Park Townhouse Project: "We . . . do not feel that all of our questions have been thoroughly answered." On March 22, 1971, two PHA representatives attended a WAIC meeting to answer community questions about the project. At the same meeting, Fred Druding was elected as the new president of WAIC and a decision was made to demonstrate the next morning in opposition to the Whitman Park Townhouse Project.

Although a groundbreaking ceremony was conducted on December 16, 1970, actual construction did not commence until March of 1971. [citations and footnotes omitted].

The evidence in this record shows that the Whitman site was designated for housing fourteen years before the effective date of NEPA; the site was cleared of all existing properties ten years prior to NEPA; the basic design and size of the project was approved three years prior to NEPA; and the 120 townhouses will be constructed on the site occupied by houses demolished pursuant to the redevelopment plan.

The Court has found seven cases which have considered the question of whether NEPA applies to an urban redevelopment project in which most if not all Federal planning and approval was obtained prior to the effective date of NEPA: *Olivares v. Martin,* 555 F.2d 1192 (5th Cir. 1977); *Hart v. Denver Urban Renewal Authority,* 551 F.2d 1178 (10th Cir. 1977); *Jones v. Lynn,* 477 F.2d 885 (1st Cir. 1973); *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973); *Marin City Council v. Marin County Redevelopment Agency,* 416 F.Supp. 700 (N.D.Calif.1975); *Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323 (S.D.N.Y.1975); and *Boston Waterfront Residents Ass'n v. Romney,* 343 F.Supp. 89 (D.Mass.1972).

*Olivares, San Francisco Tomorrow* and *Marin City Council* found the requirements of NEPA inapplicable. The remaining courts reached the opposite conclusion, but in not any one of these cases holding NEPA applicable was a site cleared of existing

houses, residents removed, and plans approved for the construction of houses on that very site, which houses were designed to be similar in appearance to those in the neighborhood.

*Olivares* arose as a consequence of attempts by the City of San Antonio to renovate its downtown area. On March 22, 1968, the Urban Renewal Agency of the City entered into a contract with HUD to enable the Agency to carry out an urban renewal project with Federal financial assistance. In 1974, the Agency offered property within the urban renewal area for bid for redevelopment in connection with the project. Bidders were to include in their bids their plans for redevelopment and/or rehabilitation and restoration of the site. In holding that the requirements of NEPA were inapplicable, the Court stated:

> all the events relevant to invoking the NEPA requirements occurred before [NEPA's] passage. The contract between the Department of Housing and Urban Development and the San Antonio Development Agency was signed in 1968. It delineated a tract for urban renewal, a delineation that has not changed.

*Olivares v. Martin,* 555 F.2d at 1197.

*San Francisco Tomorrow* concerned an urban redevelopment project in San Francisco with the following chronological series of events: HUD advanced funds to the San Francisco Redevelopment Agency to study and prepare plans for the proposed urban area in 1962; the redevelopment plan was submitted to HUD in 1964; it was approved by the Redevelopment Agency Commissioners in 1965; finally, in 1966, the plan was approved by the San Francisco City Planning Commission, adopted by the City of San Francisco Board of Supervisors, approved by HUD for Federal financing, and a loan and grant contract entered into between HUD and the San Francisco Redevelopment Agency. The Court held that

> for purposes of NEPA, major *federal* action had terminated on December 2, 1966 when HUD became contractually obligated to the San Francisco Redevelopment Agency for the loan and grants. . . .

Appellants argue that the June 26, 1970 and April 28, 1972 amendatory grants to the San Francisco Redevelopment Agency and HUD's contractual right to monitor the project as it develops to assure compliance with statutory and contractual requirements constituted major federal actions subsequent to the passage of NEPA. We hold otherwise.

Amendatory contracts which increase the federal funding only to provide for the rising costs of land acquisition and relocation of displaced residents do not constitute "further major federal action" within the meaning of the Act. Instead, such amendments represent but confirmation of the Federal Government's earlier decision that the project proposal conformed to HUD requirements and was therefore eligible for a grant and loan. *Id.* at 1025. *Accord Olivares v. Martin,* 555 F.2d at 1197–8 n. 9.

The fact situation in *Marin City Council* resembles that presented to this Court. In 1958, the Marin County Redevelopment Agency ("MCRA") and the Housing and Home Finance Administration, HUD's predecessor, entered into a loan and capital grant agreement for the residential development of a 121 acre urban renewal area. Shortly thereafter, all structures in the renewal area were demolished, and partial construction begun. The developer who had initially been engaged by MCRA stopped building houses in 1967 and there was a three year hiatus during which no further construction took place. In 1970, MCRA solicited bids from other developers interested in developing the remaining portion of the area. HUD and MCRA entered into an amendatory contract to the original contract, which authorized the expenditure of additional Federal money. In connection with plaintiffs' claim that an environmental impact statement was necessary prior to construction, the Court held:

> Since the original redevelopment plan approved in 1958 contemplated residential development of the 36 acres upon which [the development] is supposed to be built, the approval of the . . .

amendatory contract in 1972 did not materially affect the impact of the plan on the concerns behind the Act and should not be considered major federal action under the Act.

*Marin City Council v. Marin County Redevelopment Agency,* 416 F.Supp. at 706.

■ In reaching our determination that NEPA is not applicable, the Court has also been guided by HUD regulations, handbooks and directives. These HUD administrative determinations are entitled to great weight by this Court. As stated by the Supreme Court in *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.

*Accord, Columbia Broadcasting System, Inc. v. Democratic Nat. Comm.,* 412 U.S. 94, 121, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Lewis v. Martin,* 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *Rushton Mining Co. v. Morton,* 520 F.2d 716, 720 (3d Cir. 1975); *Bourne v. Schlesinger,* 426 F.Supp. 1025, 1029 (E.D.Pa.1977).

The Assistant Secretary for Community Planning and Development is the HUD officer charged with primary responsibility for enforcement of NEPA. HUD Handbook 1390.1 Ch. I ¶ 4(a). In a letter dated June 26, 1973, the Assistant Secretary for Community Planning and Development set forth HUD's policy on environmental assessments for projects approved prior to the date of NEPA. The letter provides:

> No NEPA review is required for projects in execution prior to the effective date of NEPA unless a major amendatory is proposed after January 1, 1970 for HUD approval. HUD's Draft Handbook 1390.1 (December 1972) defines a major amendatory as a significant change in the nature, magnitude or extent of the action from that which was originally evaluated and which may have a significant effect on the quality of the human environment, such as an environmentally significant

change in location or site, area covered, size or design. For purposes of urban renewal, major amendatory can be considered a major urban renewal plan amendment, i. e., (i) a significant change in a basic element of the plan, (ii) a group of minor changes in the plan which cumulatively amount to a significant change (usually an increase in size) in the area covered by the plan, or (iii) a significant change (usually an increase in size) in the area covered by the plan.

(Exhibit P–13). HUD Handbook 1390.1, concerning compliance with NEPA, in defining "major amendatory" states:

> An increase or decrease in cost is considered a major amendatory only when the increase or decrease reflects such an environmentally significant change in the project.

Chapter 1, ¶ 2(f).

■ We agree with and accept the interpretation given by the HUD regulations to the limits of the retroactive application to be given NEPA. We also agree with the reasoning of the *Olivares, San Francisco Tomorrow* and *City of Marin County* courts. We find that there has been no "major amendatory" in connection with the Whitman Park Townhouses since January 1, 1970, the effective date of NEPA, in that there have been no significant changes in the nature, magnitude or design of the townhouses. The Court further finds that there has been no environmentally significant change in location, site, area covered, size or design of the townhouses since January 1, 1970. Accordingly, although we have found that both res judicata and laches bar this litigation, the Court nevertheless holds in the alternative that, after a consideration of the merits of plaintiffs' claims, NEPA is not applicable to this project on the basis of the Court's finding that there has been no major federal action in connection with these townhouses since January 1, 1970.

While we recognize that there may be situations where subsequent to the effective date of NEPA, serious environmental problems may be encountered which might be detrimental to the environment, the evi-

dence in this case is completely lacking of any such environmental consequences. Plaintiffs' primary concern is a high noise level resulting from truck traffic on Oregon Avenue, which is south of the Whitman site. The noise from trucks using Oregon Avenue is a situation which apparently has existed for a number of years. The construction of the townhouses certainly will not aggravate this problem. Plaintiffs also complain that the Whitman area presently suffers from congested traffic, crowded schools and poor bus service, and that the addition of the residents who will occupy the 120 townhouses will aggravate these problems. These presently existing problems, which under a broad definition may be considered environmental, are conditions which the City, the school district and SEPTA are capable of correcting. In any event, accepting the plaintiffs' claims that there are approximately 14,000 people presently residing in the Whitman area, the addition of a few hundred people hardly can be expected to have more than a minimal impact on these presently existing problems.

As we have heretofore pointed out, the construction of these townhouses will have no environmentally significant impact on the area. The design of the proposed townhouses, single family, low rise construction, is of the same design as the houses presently existing in the Whitman area, and of the structures which were demolished from this site nearly twenty years ago. *RAB v. Rizzo,* 425 F.Supp. at 1009. This construction does not alter the original character of the neighborhood. *See Nucleus of Chicago Homeowners Assoc. v. Lynn,* 524 F.2d 225, 231 & n. 4 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Furthermore, present construction plans were amended to overcome the objections of WAIC and its members. After the plans were completed, "WAIC officials stated . . . that the Whitman Park Townhouse Project plans 'look excellent', that WAIC was 'very impressed with the plans' and that WAIC felt that the houses would be 'an asset to our community.'" *RAB v. Rizzo,* 425 F.Supp. at 997–998. This

development has already undergone an exhaustive consideration of alternatives.

■ Finally, a detailed environmental assessment of this project would accomplish little. The purpose of a NEPA impact statement is to guide and advise a federal agency in its decisional process. *Jones v. Lynn,* 477 F.2d 885, 889–90 (1st Cir. 1973). In connection with the construction of these townhouses, HUD and the defendants are required to proceed with construction as mandated by the Order of this Court which has been affirmed by the Court of Appeals, and concerning which *certiorari* has been denied by the United States Supreme Court. As stated by the Court in *Nucleus of Chicago Homeowners Assoc. v. Lynn,* 524 F.2d 225, 232 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976):

> With respect to HUD's failure to consider alternative courses of action, plaintiffs' position is equally unfounded. Plaintiffs complain that HUD did not consider the feasibility of broad-scale metropolitan planning and the provision of comprehensive social services to alleviate the problems of low-income public housing tenants. But since the scattered-site housing was court ordered, HUD and CHA [Chicago Housing Authority] have no alternative but to construct the housing. The only sense in which alternatives can be considered is in site selection and even here CHA and HUD must operate within the parameters of the *Gautreaux* decree.

*See N. A. A. C. P. v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194, 1202 (D.Del. 1977), *but see Environmental Defense Fund v. Tenn. Val. Auth.,* 468 F.2d 1164, 1177 & n. 9 (6th Cir. 1972).

Although we have pointed out that HUD and the other defendants have no alternative to the construction of the 120 townhouses as planned, this does not mean that HUD or any other defendants should refrain from taking such action as might mitigate or alleviate the presently existing problems in the Whitman area, provided

such action shall in no way delay or interfere with the construction or use of the 120 townhouses.

Accordingly, this Court will enter an Order rendering judgment in favor of defendants and defendant-intervenor and against plaintiffs. This memorandum is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.